*PREVIOUSLY FILED WITH THE CSO
AND CLEARED FOR PUBLIC FILING*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-0520 (RMU) |
| NASSER MAZYAD AL-SUBAIY, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1453 (RMU) |
| ABDULSALAM ALI ABDULRAMAN AL-HELA, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1048 (RMU) |
| SAEED MOHAMMED SALEH HATIM, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1429 (RMU) |

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-CV-1724 (RMU) |

## PETITIONERS' MOTION TO COMPEL INFORMATION RELATED TO MEDICAL TREATMENT

This motion arises out of the growing hunger strike at the United States military prison in Guantánamo Bay, Cuba ("Guantánamo"). Petitioners in the above-referenced actions, by their undersigned attorneys, respectfully request the Court compel Respondents to provide counsel for Petitioners immediate access to their clients, and information regarding Petitioners' health and status. In support of their application, Petitioners rely upon the following:

1.    Petitioners are citizens of Sudan, Saudi Arabia and Yemen. Since late 2001 or early 2002, Petitioners have been in the custody of the United States military and held, virtually *incommunicado*, at Guantánamo.

2.    In the past year, Petitioners, by their Next Friends, filed petitions for writs of *habeas corpus*, alleging that their detention is in violation of the Constitution, laws and treaties of the United States.

3.    For well over a month, more than 200 individuals held at Guantánamo have protested both the plethora of abuses perpetrated by Respondents against them, including recent physical beatings, as well as their ongoing detention without charge, by engaging in an open-ended refusal of both food and water.

4.    Emerging details related to the hunger strike provided to Guantánamo *habeas* counsel by their clients, including participants' openly-stated expectation of death, demonstrate that the current situation represents an unprecedented and urgent crisis, with an unconfirmed number of detainees now hospitalized with their health in grave danger.

5.    Rather than acknowledging the crisis and undertaking efforts to provide counsel, Next Friends or family with basic information regarding the health and safety of Petitioners, Respondents have instead claimed to the Court – as recently as two weeks ago, in *Al Odah v. United States*, No. 02-0828 (CKK) – that *habeas* counsel's reports regarding the hunger strike were merely "rumor." Faced with numerous media reports and incontrovertible evidence surrounding the crisis, however, Respondents were forced to concede publicly the existence of the hunger strike. *See, e.g.,* Charlie Savage, *89 Prisoners Resume Hunger Strike at Guantánamo*, Boston Globe (Aug. 26, 2005) (containing statements by Army Colonel Brad Blackner confirming that "detainees began fasting to protest their continued detention" on August 8, 2005), attached as Exh. A.

6.    Respondents also admit that, as a result of the deteriorating condition of numerous individuals, the Government has subjected at least some detainees to forced feeding. *See, e.g.,* Mike Mount, *Hunger Strike at Guantánamo Grows,* CNN.com (Sept. 13, 2005) (containing statements of Pentagon officials regarding force feeding), attached as Exh. B. In light of these reports, over the course of the past week, counsel for Petitioners in the above-referenced actions have requested information from the Government related to the health and hospitalization of their clients. In response to such requests, counsel for Respondents have refused to provide any client-specific

information, claiming instead that the Respondents are "not in a position" to provide updates on whether Petitioners are participating in the hunger strike or in a hospital.

7.    As set forth in the accompanying affidavits, counsel for Petitioners have either confirmed, or have substantial reason to believe, that their clients are participants in the mass hunger strike.  As a result, Petitioners' lives are potentially in grave jeopardy and, despite exceedingly tailored requests by counsel for specific information related to their clients' hospitalization or participation in the hunger strike, Respondents have responded with a blanket refusal to provide any such information or access to Petitioners.

8.    The Government's response to the current crisis has been wholly inadequate and in violation of accepted American and international standards for treatment of prisoners who elect to participate in a hunger strike.  *See, e.g., World Medical Declaration on Hunger Strikers* (Sept. 1992); *American Correctional Health Services Position Statement on Hunger Strikes* (Aug. 1994), attached as Exhs. C, D, respectively.

9.    Thus, in light of the urgent nature of the issues presented by this application, Petitioners request that the Court grant the following relief:

   a)  Immediate access to Guantánamo by representative counsel to visit with and to ensure that they are receiving adequate medical treatment;

   b)  Immediate telephonic access between counsel and clients;

   c)  Telephonic access between counsel, Next Friends, family members and clients;

   d)  Access by counsel to records indicating Petitioners' medical treatment, meal schedules, punishment and hospitalization; and

e) Respondents' policies and actions taken with respect to the current and previous hunger strikes.

10.    As publicly conceded by the Government and well-documented in the public record, the detainees at Guantánamo have endured numerous abuses at the direction of United States officers and agents, including torture and interrogation practices which violate both American and international rules governing such conduct.

11.    *Habeas* counsel have received information from clients detailing such abuses, which have included denial of food and water, physical beatings, sexual humiliation, religious violations and prolonged psychological distress.

12.    These abuses have had a profound effect on the mental, physical and emotional state of Petitioners.

13.    On or around August 25, 2005, counsel for Petitioners learned that, as of some two weeks earlier, the second of two recent hunger strikes had commenced at Guantánamo due to detainee complaints that (1) military authorities had failed to meet the obligations agreed to in an agreement between detainees and Respondents that had ended a prior hunger strike just two months ago; (2) detainees continue to be subject to physical, psychological and religious abuses; and (3) detainees continue to be held without charge or adequate process. *See, e.g.,* Declaration of Julia Tarver at ¶ 5 ("Tarver Aff."), attached as Exh. E.

14.    According to recent news reports, Respondents have indicated that the strike involves approximately 131 individuals. *See Hunger Strike Grows in Guantánamo*, Chi. Sun-Times (Sept. 16, 2005), attached as Exh. F. *Habeas* counsel who have visited the base in recent weeks, however, report that at least 200 individuals are participating in the hunger strike. In support of this statement, counsel has annexed the

unclassified statement of detainee and *habeas* petitioner Binyam Mohammed, who reports that the renewed hunger strike involves 210 detainees. *See* Statement of Binyam Mohammed (Aug. 11, 2005), attached as Exh. G (provided by counsel for Mohammed).

15.    The number of participants in the hunger strike has continued to grow on a daily basis. *See* Carol D. Leonnig, *More Join Guantánamo Strike*, Wash. Post (Sept. 13, 2005), attached as Exh. H.  In fact, almost forty detainees had joined the strike since last Friday, according to statements made by military officials on September 13, 2005, *see id.*, and an additional eleven detainees have been officially reported as having joined in the past two days. *See* Exh. F.

16.    As time progresses, the health of detainee participants has drastically deteriorated. *Habeas* counsel and news media have reported that, as a result of the strike, twenty-one detainees are currently hospitalized. *See* Exh. F.

17.    Furthermore, Respondents have conceded that, as of September 16, 2005, 20 individuals are being forcibly subject to involuntary medical intervention via the introduction of intravenous fluids or nasoenteric (nasal) tube feeding. *See* Exh. F.

18.    As set forth in the accompanying affidavits, counsel for Petitioners have substantial reason to believe that many, if not all, of their clients are participants in the current strike.

19.    For example, several Petitioners were participants in the early June/July hunger strike, a fact confirmed by counsel who visited with Petitioners during that time. *See, e.g.,* Tarver Decl. at ¶ 5; Declaration of David H. Remes at ¶ 4-5 ("Remes Decl."), attached as Exh. I.

20.    For example, during the course of the first hunger strike, Petitioner Abdulmalik Adbulwahab, who refused food for 12-13 days, passed out several times, urinated blood and was forcibly injected with intraveneous fluids. *See* Remes Decl. at ¶ 5.

21.    Also during a visit in July 2005, counsel for the *Al-Oshan* and *Al–Subaiy* Petitioners learned that one client had persisted for so long in the hunger strike that he was hospitalized for several days and fed intraveneously, during which time he was unconscious for at least four days. *See* Tarver Decl. at ¶¶ 7-8.

22.    Upon his awakening, our client, who has been detained since he was a juvenile, was repeatedly visited by individuals purporting to be military officials. Tarver Decl. at ¶ 9. These individuals assured our client that his release had been approved by the Government and would take place in approximately three weeks' time. *Id.* In light of these assurances, the petitioner agreed to end his strike. *Id.* at ¶ 10.

23.    As more than six weeks have past since the Government made these assurances – and Respondents have not yet filed advance notice of any petitioner's release or transfer, as required – it is clear that the Government has reneged on the promise made to our young client. *See* Tarver Decl. at ¶¶12-13.

24.    Counsel for Petitioners, and others, have every reason to believe that their clients are once again participating in the hunger strike, given Respondents' blatant failure to keep the promises they made in order to end the previous strike.

25.    Further, from recent meetings with Petitioner Al-Hela, counsel believes that he is participating in the current hunger strike, which is widespread. *See* Remes Decl. at ¶ 6.

26.     Counsel make this application for emergency relief because there are no other viable options for gaining access to Petitioners in the timely fashion required under the exigent circumstances. *See* Declaration of Gitanjali S. Gutierrez, at ¶¶ 4-6 ("Gutierrez Decl."), attached as Exh. J.

27.     Counsel have requested information related to Petitioners' health and hospitalization, but Respondents have refused to provide any such client-specific information. *See, e.g.,* Exh. K.

28.     On September 2, 2005, for example, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners requested information about whether any clients had been hospitalized or "in serious need of medical attention." *See* Exh. K. Additionally, counsel requested telephone access to Petitioners to ensure that they were receiving adequate medical attention. *Id.*

29.     Despite repeated requests for a timely response, counsel for Respondents did not provide an answer until seven days later, on September 9, 2005. *See* Exh. K.

30.     In their response, the Government refused to provide telephone access or any information about Petitioners, stating that "GTMO is not in a position to provide continuous updates" with respect to whether a Petitioner is hospitalized or refusing meals. *See* Exh. K.

31.     The Government's response, identical to those received in response to similar requests made by *Al-Hela* counsel, made clear its application to "the more than 200 other habeas petitioners at GTMO." *See* Exh. K; Remes Decl. at ¶ 8.

8

32.     Thus, Respondents have effectively stated that they will not, as a blanket policy, provide any client-specific information related to a detainee's refusal to accept food and water or hospitalization resulting from the hunger strike.

33.     Thus, without outside of intervention by the Court, counsel has no effective means of accessing Petitioners or ascertaining information about their health.

34.     As the Court is likely well aware:

- Visits to Guantánamo require extensive planning and coordination, including security clearance and approvals from the Departments of Justice and Defense, normally at least a month in advance. Extremely limited commercial flights are available for the base.[1] As a result, and given the expenses involved, counsel may only arrange only periodic trips, well in advance, with the Government's approval.

- The Government generally prohibits counsel from communicating with clients via telephone or fax, although the Protective Order, by its terms, permits telephonic access in certain circumstances.

- Delays in attorney-client mail are egergious, with letters often taking well over six weeks to reach clients or counsel.

- Petitioners are regularly denied access to pens or paper for letters to counsel.

- Moreover, Petitioners' compromised health will likely limit their capacity to effectively reach out to counsel for assistance.

- Next friend family members rely almost exclusively upon habeas counsel for timely information about their imprisoned relatives.

35.     As a result of Respondents' refusal to provide the requested access and information, and the exigent circumstances presented by the current crisis, counsel for Petitioners come before the Court to request this limited emergency relief.

---

[1]     In fact, on certain days of the week, there are no commercial flights to or from Guantánamo, and even when flights are available, space is limited, as the largest aircraft can only hold approximately 15 passengers at a time.

36.    *First,* understanding the logistical burden upon both the Government and counsel to arrange for a visit on such short notice, Petitioners request that representative counsel be granted immediate access to Guantánamo, for the purpose of assessing the medical treatment and condition of all Petitioners. [2]

37.    *Second*, counsel for Petitioners request immediate telephone access to their clients to determine their health and well-being, as well as whether they require counsel to take continued legal action to protect their rights.

38.    *Third,* Petitioners request telephone access with their Next Friends or family members. Family members may be able to communicate more effectively with Petitioners, who are in a compromised and debilitated medical state.[3]

39.    *Fourth,* counsel for Petitioners request access to records regarding Petitioners' medical treatment, meal schedules, punishment and hospitalization, as well as Respondents' policies and actions taken with respect to the current and previous hunger strikes.

40.    Counsel for Petitioners also respectfully request a conference before the Court to discuss the issues presented by the within motion.

---

[2]    Such a visit was recently arranged by Respondents in *Al Odah v. United States*, No. 02-0828 (CKK) (in light of hunger strike motion, for emergency access to clients filed).

[3]    Furthermore, failure to provide families with notice of a detainees' participation in a hunger strike violates World Medical Association (WMA) Guidelines for the Management of Hunger Strikers. *See* Exh. C. *See also* Exh. D.

**WHEREFORE**, for the above-stated reasons and for any other reason that may become known to the Court, Petitioners respectfully request the Court grant the above requested relief.

Dated: New York, New York
       September 16, 2005

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:
_____/s/_____
Julia Tarver (NY0029)
Jennifer Ching
Andrea J. Prasow

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
*Counsel for Petitioners Al Joudi et al.*

**COVINGTON & BURLING**
David H. Remes
D.C. Bar No. 370782
1201 Pennsylvania Ave. NW
Washington, DC 20004
(202) 662-5212

Marc D. Falkoff
D.C. Bar. No. 491149
1330 Avenue of the Americas
New York, NY 10019
(212) 841-1166

*Counsel for Petitioners Al-Hela, et al.
       and Hatim, et al.*

**DEBEVOISE & PLIMPTON LLP**
John B. Missing (Bar No. 425469)
Jennifer C. Argabright (Bar. No. 480763)
555 13th Street, N.W. Ste 1100E
Washington, D.C. 20004-1169
(202) 383-8000

Jeffrey I. Lang
Jennifer R. Cowan
Ellen A. Hochberg
Tatia L. Miller
Hadassa Waxman
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Of Counsel*
**CENTER FOR CONSTITUTIONAL RIGHTS**
Barbara Olshansky
Gitanjali Gutierrez
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

*Counsel for Petitioners Bin Amir et al.*

# Exhibit A

# 89 prisoners resume hunger strike at Guantanamo

Detainees say US military broke July pact

Charlie Savage
Boston Globe Staff
August 26, 2005

WASHINGTON -- New tensions between Guantanamo Bay detainees and the US military have prompted 89 prisoners to resume a hunger strike that so far has left seven hospitalized, a spokesman for the military operation confirmed yesterday.

The prisoners, protesting their living conditions and their continued detention without trials, had undertaken a widespread hunger strike that ended in July. Word that the hunger strike had resumed was disclosed yesterday by Clive Stafford Smith, a British human rights lawyer who returned from visiting clients at the base a week ago.

Smith warned that many detainees have grown so desperate that they intend to starve themselves to death in an effort to create a public relations disaster for the US military. No detainee has died at the prison since it opened in January 2002, but, in the view of lawyers who have talked to clients, there have been signs of extreme frustration this summer.

According to Smith's newly declassified notes, his client Binyam Mohammed, a British refugee from Ethiopia, told him on Aug. 11 that many among the prison population had decided to resume their hunger strike. The decision was sparked by rumors of a violent interrogation session and two rough extractions of detainees from their cells, as well as a new incident of alleged desecration of a copy of the Koran, the Muslim holy book.

The detainees viewed the rumors as a violation of an agreement struck at the end of July to bring an end to the hunger strike, Smith said. Meeting with detainee representatives, the military had promised a series of improvements to living conditions if they would start eating again.

"They have betrayed our trust," Smith's declassified notes quote Mohammed as saying. "Therefore the strike must begin again. Some have already begun. . . . I do not plan to stop until I either die or we are respected. People will definitely die."

Army Colonel Brad Blackner, a spokesman for the prison operation, confirmed yesterday that "detainees began fasting to protest their continued detention" on Aug. 8. He said the military views this as a continuation of the July hunger strike, not a new one.

"We are monitoring some detainees who have missed at least nine meals over a 72-hour period, which we define as a hunger strike," Blackner said.

Smith was the last attorney to return from Guantanamo because the military did not allow any detainee representatives to visit the base last week. He represents several dozen detainees, but only his notes of his conversation with Mohammed have been partially declassified. "This is all that is unclassified for now, but you can imagine that there is much more," he said. "This is very urgent, as you can infer from the statement that if they stopped eating on Aug. 11 or so, this means that some of them could be getting in serious physical problems by the next week or so."

But Blackner said that the prison had dealt with hunger strikes regularly since the start, and that medical staff were closely monitoring the fasting detainees. Camp policy is to force-feed any detainee "to avert death from fasting and from dehydration," he said.

Smith's report of the resumption of the hunger strike was made as the military has declassified the notes of other lawyers who visited the base in the last month, clearing them to disclose what their clients told

them about what has been happening this summer.

Several lawyers said their clients reported that about 200 of the 500 prisoners participated in the July hunger strike, resulting in several dozen hospitalizations requiring intravenous fluids. The military said the number was closer to 100. Many detainees started to eat again around July 28, after the military promised to make concessions that allegedly varied from specific improvements to their living conditions to assurances they would receive trials.

Detainees were allegedly promised better access to books and that they would receive bottled drinking water with each meal, instead of having to drink what they considered unpalatable water out of the sinks in their cells. The military said last week it was seeking to expand the size of its library. Several attorneys said the military had started supplying bottled water in early August.

Jonathan Hafetz, who visited the base in late July to meet with a Qatari client, said his newly declassified notes indicate that the prisoners were primarily interested in improving their physical and religious conditions.

"He attributed the strike to the bad water and the lack of respect for Islam," he said. "For example, guards laughed at prisoners when they are praying and disrespect the Koran when they go into a cell to [restrain] a prisoner."

Joshua Colangelo-Bryan, who visited his six Bahraini clients in late July and early August, said things did improve after the agreement. In a cellblock where at least one of his clients is housed, he said, the military began turning off loud industrial fans during the calls-to-prayer.

"It was also said that international law would be recognized at Guantanamo, whatever that means," Colangelo-Bryan said. "It seems there was a probationary period . . . and if things did not change within that time, then a hunger strike of more severe proportions could be undertaken."

By the end of the first week of August, there was rising discontent among detainees who believed that they had been misled in order to get them to start eating again. Lawyer David Remes said his Yemeni clients told him during the first week of August that detainees were starting to doubt the promises that had been made in order to get them to relent.

"There is a sense that the government tricked them into ending their hunger strike by promising them the moon because the government couldn't tolerate a situation in which detainees were placing themselves at risk of death or serious injury as a result of being on the hunger strike," Remes said.

# Exhibit B

 WITH FREE VIDEO **.com** Member Services

International Editio

SEARCH    ● THE WEB    ○ CNN.com    [          ]    SEARCH    Powered by

Home Page
World
U.S.
Weather
Business
Sports
Politics
Law
Technology
Science & Space
Health
Entertainment
Travel
Education
Special Reports
Video
Autos

# WORLD

## Hunger strike at Guantanamo grows

### Eighteen detainees being force-fed; 128 now refusing to eat

From Mike Mount
CNN

Tuesday, September 13, 2005; Posted: 10:27 p.m. EDT (02:27 GMT)

**WASHINGTON (CNN) -- The number of Guantanamo Bay detainees taking part in a hunger strike has swelled to about a quarter of the prison population over the past month, according to Pentagon officials.**

Since August 8, the number of detainees refusing food has slowly increased from several dozen to 128, according to the Pentagon.

Eighteen prisoners are in medical facilities forcibly receiving nutrition intravenously or through nasal tubes, Pentagon officials said.

Last month officials said 89 detainees were refusing to eat and 12 were receiving forced nutrition in the medical facility.

Since the prison camp at the U.S. Naval Station in Guantanamo Bay, Cuba, opened in January 2002, there have been numerous hunger strikes by detainees. No prisoner has died from starvation, according to Pentagon officials.

"Regulations are the same at Guantanamo as they are in the U.S. prison system, and prisoners will not be allowed to kill themselves by starving themselves," a Pentagon official said.

Pentagon officials said the detainees are protesting their continued detention, but past detainee protests have occurred because of perceived treatment of the Quran by prison guards and treatment of the detainees by guards.





advertiser links    what's this?

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make...
www.vonage.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions....
www.mycashnow.com

**Refinance Rates Fall Again**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

## RELATED

- U.S. officials: Transfer talks active
- CNN tours Gitmo prison camp
- U.N. experts blast U.S.

---

Whistle while you work... and play! citi

SERVICES
E-mail Newsletters
Your E-mail Alerts
RSS
CNNtoGO
Contact Us

SEARCH
● WEB ○ CNN.com
[          ]
SEARCH Powered by
YAHOO! search

Search Je
Enter Keyw
Enter City
careerbu

Finc
Air
Chec
Book
FLYi.
fly
inc

The previous hunger strike at the prison, known as Camp Delta, was in late July, when 68 detainees stopped eating.

All of the detainees started eating again on their own before the August 8 hunger strike, according to Pentagon officials.

The Washington Post reported Monday that lawyers for some of the detainees claim their clients are refusing to eat to protest their detention as well as the beatings they allege some detainees are receiving from prison guards.

Pentagon officials flatly deny that any of the detainees are beaten, including uncooperative ones.

• Russian detainees freed
• Suicide tries called 'coordinated'

YOUR E-MAIL ALERTS

Guantanamo Bay Naval Base    ⌀
(Cuba)

ACTIVATE  or Create Your
Own

Manage Alerts | What Is This?

The Defense Department says more than 500 detainees are being held at the detention facility. Most were captured during the U.S.-led war in Afghanistan against the al Qaeda terrorist network and its local allies.

More than 30 countries are represented. But citizens from Saudi Arabia, Afghanistan and Yemen account for the majority of the detainees, 129, 110 and 107, the two U.S. officials told CNN last month.

Human rights activists and the Red Cross have criticized the treatment of prisoners at Guantanamo Bay. The controversy surrounding the facility in recent months prompted some lawmakers to suggest that it may need to be shut down.

But Bush administration officials have defended Guantanamo Bay. Vice President Dick Cheney said in June that the U.S. Guantanamo policy "is the correct one" and that all detainees are "treated with respect and dignity." (Full story)

News of the growing detainee protest came a day after Pentagon officials said Mullah Adbul Salam Zaeef, once the Taliban's ambassador to Pakistan and its primary spokesman during the early days of the U.S. invasion of Afghanistan, was released after an agreement between the Afghan government and the United States.

He was flown to Afghanistan from the Cuban base. He had been held at the prison camp since January 2002 after being arrested by Pakistani authorities and turned over to the United States.

**Story Tools**

⊙💾 SAVE THIS    ⊙✉ E-MAIL THIS
⊙🖨 PRINT THIS    ⊙☆ MOST POPULAR

advertisement

Click Here to try 4 Free
Trial Issues of Time!



**WORLD**

Section Page · Video · International Edition

Iraq blasts claim 100 lives



• 2nd embassy blast death sentence
• U.N. reform agenda watered down
• Nigerians protest at fuel prices

**TOP STORIES**

Home Page · Video · Most Popular

Nursing home owners charged



• Baghdad attacks kill more than 100
• Carolinas brace for Hurricane Ophelia
• Roberts sidesteps specifics

# Exhibit C





**WMA, the global representative body for physicians**



## THE WORLD MEDICAL ASSOCIATION

| Français | Español |

Home
About the WMA
WMA History
Policy
Members
Press Releases
Publications
Meetings and Events
Ethics Unit
Human Rights
Continuing Medical
Education
Links
Contact

## Policy

World Medical Association Declaration on Hunger Strikers

Adopted by the 43rd World Medical Assembly Malta, November 1991and editorially revised at the 44th World Medical Assembly Marbella, Spain, September 1992

PREAMBLE

1. The doctor treating hunger strikers is faced with the following conflicting values:

    1. There is a moral obligation on every human being to respect the sanctity of life. This is especially evident in the case of a doctor, who exercises his skills to save life and also acts in the best interests of his patients (Beneficence).

    2. It is the duty of the doctor to respect the autonomy which the patient has over his person. A doctor requires informed consent from his patients before applying any of his skills to assist them, unless emergency circumstances have arisen in which case the doctor has to act in what is perceived to be the patient's best interests.

2. This conflict is apparent where a hunger striker who has issued clear instructions not to be resuscitated lapses into a coma and is about to die. Moral obligation urges the doctor to resuscitate the patient even though it is against the patient's wishes. On the other hand, duty urges the doctor to respect the autonomy of the patient.

    1. Ruling in favour of intervention may undermine the autonomy which the patient has over himself.

    2. Ruling in favour of non-intervention may result in a doctor having to face the tragedy of an avoidable death.

3. A doctor/patient relationship is said to be in existence whenever a doctor is duty bound, by virtue of his obligation to the patient, to apply his skills to any person, be it in the form of advice or treatment.

This relationship can exist in spite of the fact that the patient might not consent to certain forms of treatment or intervention.

Once the doctor agrees to attend to a hunger striker, that person becomes the doctor's patient. This has all the implication and responsibilities inherent in the doctor/patient relationship, including consent and confidentiality.

4. The ultimate decision on intervention or non-intervention should be left with the individual doctor without the intervention of third parties whose primary interest is not the patient's welfare. However, the doctor should clearly state to the patient whether or not he is able to accept the patient's decision to refuse treatment or, in case of coma, artificial feeding, thereby risking death. If the doctor cannot accept the patient's decision to refuse such aid, the patient would then be entitled to be attended by another physician.

GUIDELINES FOR THE MANAGEMENT OF HUNGER STRIKERS
Since the medical profession considers the principle of sanctity of life to be fundamental to its practice, the following practical guidelines are recommended for doctors who treat hunger strikers:

1. DEFINITION
    A hunger striker is a mentally competent person who has indicated that he has decided to embark on a hunger strike and has refused to take food and/or fluids for a significant interval.

2. ETHICAL BEHAVIOUR
    1. A doctor should acquire a detailed medical history of the patient where possible.

    2. A doctor should carry out a thorough examination of the patient at the onset of the hunger strike.

    3. Doctors or other health care personnel may not apply undue pressure of any sort on the hunger striker to suspend the strike. Treatment or care of the hunger striker must not be conditional upon him suspending his hunger strike.

4. The hunger striker must be professionally informed by the doctor of the clinical consequences of a hunger strike, and of any specific danger to his own particular case. An informed decision can only be made on the basis of clear communication. An interpreter should be used if indicated.

5. Should a hunger striker wish to have a second medical opinion, this should be granted. Should a hunger striker prefer his treatment to be continued by the second doctor, this should be permitted. In the case of the hunger striker being a prisoner, this should be permitted by arrangement and consultation with the appointed prison doctor.

6. Treating infections or advising the patient to increase his oral intake of fluid (or accept intravenous saline solutions) is often acceptable to a hunger striker. A refusal to accept such intervention must not prejudice any other aspect of the patients health care. Any treatment administered to the patient must be with his approval.

3. CLEAR INSTRUCTIONS
The doctor should ascertain on a daily basis whether or not the patient wishes to continue with his hunger strike. The doctor should also ascertain on a daily basis what the patient's wishes are with regard to treatment should he become unable to make an informed decision. These findings must be recorded in the doctors personal medical records and kept confidential.

4. ARTIFICIAL FEEDING
When the hunger striker has become confused and is therefore unable to make an unimpaired decision or has lapsed into a coma, the doctor shall be free to make the decision for his patient as to further treatment which he considers to be in the best interest of that patient, always taking into account the decision he has arrived at during his preceding care of the patient during his hunger strike, and reaffirming article 4 of the preamble of this Declaration.

5. COERCION
Hunger strikers should be protected from coercive participation. This may require removal from the presence of fellow strikers.

6. FAMILY
The doctor has a responsibility to inform the family of the patient that the patient has embarked on a hunger strike, unless this is specifically prohibited by the patient.



[ Introduction and history | Handbook | Council Resolutions ]

2003 - Designed by GoldenNet

# Exhibit D

American Correctional Health Services Association

### *Position Statement on Hunger Striking Prisoners*

Adopted 7 August 1994

The Policy and Standards Committee, chaired by Steven Spencer, MD, began their work on a position statement on the management of the hunger striking prisoner in response to a statement issued by the World Medical Association (WMA). The original WMA statement was published in the Winter 93 issue of *CorHealth*.

Prior to the development of this ACHSA position statement, the WMA statement was distributed to all state Department of Corrections and state medical associations, along with a questionnaire regarding their policies. Responses were received from 23 state corrections departments and 6 state medical societies.

A draft statement was developed and presented for discussion at the 1994 Multi-disciplinary Training Conference. More than 100 participants contributed their thoughts for consideration.

The following statement was based on the input from state departments of corrections, state medical societies, and concerned health care professionals. This statement was officially adopted by the ACHSA Board of Directors on 7 August 1994.

> *The management of a hunger striking prisoner presents an ethical conflict between the obligation to preserve life and relieve suffering on the one hand, and the obligation to respect patient autonomy on the other. Correctional health care providers should make every reasonable effort to honor patient self-determination. However, the deprivation of freedom which incarceration imposes will affect decision making by the inmate patient. Therefore, special efforts in patient education and counseling are indicated.*

> *A prisoner may begin a hunger strike for various reasons. If pursued, it may have a fatal outcome, unless there is medical intervention. Correctional health care providers have a special duty to protect inmates from self-destructive behavior. When a prisoner initiates a hunger strike, and efforts to counsel and dissuade are not successful in terminating the strike, the responsible physician is obligated to obtain thorough medical and psychiatric evaluations and to monitor weight loss and other parameters of deteriorating health in an appropriate medical setting. Treatment of intercurrent medical problems must be offered. The hunger striking inmate should be informed that authorization will be requested to intervene with forced feeding when life is in danger.*

> *Since forced feeding is a form of involuntary treatment, the responsible medical authority must seek the consent of the court or a legally appointed guardian, following the local requirements for involuntary treatment. The physician should make it clear to the court and to all others concerned, however, that ethical medical conduct*

American Correctional Health Services Association                                    Page 7 of 7

*in this setting demands medical intervention to preserve life from actions that are self-destructive.*

*ACHSA members should give careful consideration to the development of policies and procedures which provide a responsible and compassionate approach to the hunger striking prisoner, and which make it clear that efforts will be made to intervene with forced feeding in order to save life.*

---

**American Correctional Health Services Association**
250 Gatsby Place, Alpharetta, GA 30022-6161
Toll Free 1-877-918-1842  Fax 770-650-5789
Email: admin@achsa.org or achsa@bellsouth.net
Privacy Policy    Conference Refund Policy    Exhibit Refund Policy

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | **Case No. 1: 05-CV-00520 (RMU)** |
| NASSER MAZYAD ABDULLAH AL-SUBAIY, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | **Case No. 1: 05-CV-01453 (RMU)** |

**DECLARATION BY JULIA TARVER, ESQ.**

I, Julia Tarver, declare that the following statements are true to the best of my knowledge, information, and belief:

1.      I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners in the above-captioned action.  I offer this Declaration in support of Petitioners' Motion to Compel Information Related to Petitioners' Medical Treatment.

2.      Based on our communications with them, we believe that the majority, if not all, of our clients are participants in the current hunger strike.

3.      In July 2005, my colleagues and I visited with nine clients at Guantánamo.

4.      During this visit, we learned that countless detainees – as media accounts had already revealed – were participating in a hunger strike to protest the inhumane conditions at Guantánamo.

5.      Through our meetings, we learned that several, if not all, of our clients had been or were participating in the hunger strike.  They confirmed media reports that the reasons for the hunger strike included Respondents continued abusive, inhumane treatment, lack of clean water and adequate medical care, and a demand – one Petitioners have pursued in these proceedings – that the detainees be formally charged by the United States Government and told the reasons for their continued detention.

6.      One of our clients who participated in this hunger strike was a juvenile at the time of his detention by the United States, and we believe he is one of the youngest detainees held at Guantánamo.

7.      For approximately one month, our client refused food.  For nine to ten days, he refused water.

8.      Prior to our visit, our client had been hospitalized for several days. He was unconscious for at least four days' time, and fed intravenously.  Indeed, he had to be transferred from the clinic in a medical van to meet with us.  He was very weak and in a precarious medical condition that was obvious even to us as laypersons.

2

9.    Our client told us that the day before our visit he ended his participation in the hunger strike because he had received repeated visits from individuals purporting to be high-level military officers.  These individuals assured him that the Government had already agreed to his release, that authorizations of such release had already been signed in Washington, and that he was scheduled to leave Guantánamo in approximately three weeks' time.

10.    As a result of this news, our client agreed to end his participation in the hunger strike.

11.    As evidenced by the within application, our client has not been released, nor have Respondents provided any notice of such release.

12.    Hence, because more than six weeks have passed since our last visit – and the Government has failed to provide the Court-ordered thirty-days' notice of release – we have no choice but to assume that these were false promises that were made to him by the Government, most likely to save Respondents from the domestic and international shame and embarassment that would result from a dead juvenile detainee at Guantanamo, who had starved himself to death because of the deplorable conditions there.

13.    Undoubtedly, the realization that the Government deceived him has likely had a terrible impact on our young client.

14.    We believe that our client has likely rejoined the current hunger strike, and, in light of his serious medical condition resulting from the last strike, we strongly believe his health is in grave danger.

3

15.    In addition, we believe other clients have also chosen to participate in the hunger strike.

16.    At least three of these clients have chronic medical conditions – including epilepsy – which will only be exacerbated by the refusal of food and water, and which require immediate medical attention.

17.    The Government has failed to allow us any form of reliable access to our clients.

18.    In the past, our mail to clients, sent via Respondents' legal mail channels, has been delayed for well over six weeks.

19.    Nor have we received mail from our clients in a timely fashion.  In fact, just this afternoon, we learned that letters from clients, dating back to June 2005, had just been delivered to the secure facility in Washington D.C.  The Department of Justice Court Security Office informed us that a clerical error had delayed the delivery of this mail for *three* months.

20.    I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September 2005
New York, New York

_____/s/_____
Julia Tarver

4

# Exhibit F

# CHICAGO SUN-TIMES
### www.suntimes.com

Back to regular view
http://www.suntimes.com/output/news/cst-nws-hung16.html

Print this page

# Hunger strike grows in Guantanamo

*September 16, 2005*

SAN JUAN, Puerto Rico -- A hunger strike at the U.S. prison for terror suspects in Guantanamo Bay, Cuba, has grown to its largest point since detainees began their latest protest more than a month ago, a military official said Thursday.

After 11 detainees joined the protest overnight, there are now 131 taking part in the hunger strike, said Maj. Jeff Weir, a spokesman for the detention center.

Twenty-one of the striking prisoners were hospitalized in stable condition at the prison medical clinic, including 20 who were being tube-fed, Weir said.

The military considers a hunger strike to be a form of suicide and Weir said that one prisoner was restrained after he resisted having a feeding tube inserted.

Guantanamo officials said this latest hunger strike began Aug. 8 with 76 detainees protesting their confinement. It has since grown to more than a quarter of the approximately 500 detainees.

*AP*

Copyright © The Sun-Times Company
All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Exhibit G

## STATEMENT OF BINYAM MOHAMMED.

I AM BINYAM MOHAMMED. I AM 27 YEARS OLD. I WAS SEIZED BY THE AMERICANS ON APRIL 10, 2002, AND I HAVE BEEN HELD BY THEM SINCE. THEY TOOK ME FORCIBLY TO MOROCCO WHERE I ENDURED 18 MONTHS OF TORTURE FROM JULY 21, 2002, TO JANUARY 21, 2004. I WAS THEN TAKEN BY THE AMERICANS ⊗ TO AFGHANISTAN AND, ON SEPTEMBER 19, 2004, TO GUANTANAMO BAY.

ALL THIS TIME THE CONDITIONS OF MY CONFINEMENT HAVE BEEN A NIGHTMARE. ALONG WITH OTHER U.S. PRISONERS, I HAVE BEEN ROUTINELY HUMILIATED AND ABUSED, AND CONSTANTLY LIED TO.

WE WERE VERY, VERY PATIENT HERE IN GUANTANAMO, BUT FINALLY ENOUGH WAS ENOUGH. AND IN LATE JUNE WE ORGANIZED A STRIKE ACROSS THE PRISON. PEOPLE REFUSED FOOD AND WATER, SOME FOR OVER 20 DAYS, AND BECAME SO WEAK THEY WERE HOSPITALIZED. THEY REFUSED AN I.V. DRIP AND THE DOCTOR TOLD THEM THAT HE COULD NOT FORCE THEM TO TAKE SUSTENANCE EVEN IF THEY WERE IN A COMA. HE HAD THE PEOPLE IN HOSPITAL CONFIRM TWICE BEFORE WITNESSES THAT THEY REFUSED ~~ANY~~ RESUSCITATION IF IT CAME TO THAT.

THE ADMINISTRATION EVENTUALLY AGREED, IF WE STOPPED THE HUNGER STRIKE, TO NEGOTIATE IN GOOD FAITH. I HAD NOT EATEN FOR JUST FOUR DAYS BUT I HAD BEEN VERY WEAK AND FALLEN DOWN.

THE ADMINISTRATION PROMISED THAT IF WE GAVE THEM

UNCLASSIFIED

TEN DAYS, THEY WOULD BRING THE PRISON INTO COMPLI-

ANCE WITH THE GENEVA CONVENTIONS. THEY SAID THIS HAD

BEEN APPROVED BY DONALD RUMSFELD HIMSELF IN WASHINGTON,

D.C.

AS A RESULT OF THESE PROMISES, WE AGREED TO END THE

STRIKE ON JULY 28th, 2005.

IT IS NOW AUGUST 11th 2005. THEY HAVE BETRAYED OUR

TRUST (AGAIN). HISHAM FROM TUNISIA WAS SAVAGELY BEATEN

IN HIS INTERROGATION, AND THEY PUBLICLY DESECRATED THE

QUR'AN (AGAIN). SHAH FROM KUWAIT WAS EXF'd FOR REFUSING

TO GO (AGAIN) TO INTERROGATION BECAUSE THE FEMALE INTERROGATOR

HAD SEXUALLY HUMILIATED HIM (AGAIN) FOR 5½ HOURS. OMAR THE

KID FROM CANADA WAS EXF'd (AGAIN) FOR REFUSING TO GO TO

ANOTHER ILLEGAL INTERROGATION.

THEREFORE THE STRIKE MUST BEGIN AGAIN. SOME HAVE

ALREADY BEGUN - 150 HAVE BEGUN IN CAMPS I, II & III. 60

PEOPLE IN CAMP I BEGIN TODAY.

I WILL BEGIN TOMORROW - FRIDAY AUGUST 12th, 2005. I

DO NOT PLAN TO STOP UNTIL I EITHER DIE OR WE ARE RESPECTED.

600 PEOPLE WILL DEFINITELY DIE.

BOBBY SANDS PETITIONED THE BRITISH GOVERNMENT TO STOP

THE ILLEGITIMATE INTERNMENT OF IRISHMEN WITHOUT TRIAL.

HE HAD THE COURAGE OF HIS CONVICTIONS, AND HE STARVED HIMSELF

TO DEATH. NOBODY SHOULD BELIEVE FOR ONE MOMENT THAT MY

08/23/05  TUE 12:58 FAX 202 305 7872      LITIGATION SEC.                          ☒020
AUG. 15. 2005   6:13 PM      32                                          NU. 219   P. 11  1458

BROTHERS HERE HAVE LESS COURAGE - ALTHOUGH NOBODY

SHOULD BELIEVE, EITHER, BELIEVE THAT WE ARE TERRORISTS, OR

~~WE~~ WILL RESORT TO VIOLENCE. WE TAKE OUR INSPIRATION ~~⬛⬛~~

~~⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛~~, ULTIMATELY AND

EXCLUSIVELY, FROM OUR GOD.

   WE ASK ONLY FOR JUSTICE : TREAT US AS PROMISED

UNDER THE RULES OF THE GENEVA CONVENTIONS FOR CIVILIAN

PRISONERS WHILE WE ARE HELD, AND EITHER TRY US FAIRLY

FOR A VALID CRIMINAL CHARGE OR SET US FREE.

   AUGUST 11TH 2005

UNCLASSIFIED

Statement of Binyam Mohammed
Dated August 11, 2005

I am Binyam Mohammed. I am 27 years old. I was seized by the Americans on April 10, 2002, and I have been held by them since. They took me forcibly to Morocco where I endured 18 months of torture from July 21, 2002, to January 21, 2004. I was then taken by the Americans to Afghanistan and, on September 19, 2004, to Guantanamo Bay.

All this time the conditions of my confinement have been a nightmare. Along with other U.S. prisoners, I have been routinely humiliated and abused and constantly lied to.

We were very, very patient here in Guantanamo. But finally enough was enough, and in late June we organized a strike across the prison. People refused food and water, some for over 20 days, and became so weak they were hospitalized. They refused an I.V. drip and the doctor told them that he could not force them to take sustenance even if they were in a coma. He had the people in the hospital confirm twice, before witnesses, that they refused resuscitation if it came to that.

The administration eventually agreed, if we stopped the hunger strike, to negotiate on good faith. I had not eaten for just four days but I had been very weak and fallen down.

The administration promised that if we gave them ten days, they would bring the prison into compliance with the Geneva Conventions. They said this had been approved by Donald Rumsfeld himself in Washington, D.C.

As a result of these promises, we agreed to end the strike on July 28th, 2005.

It is now August 11th, 2005. They have betrayed our trust (again). Hisham from Tunisia was savagely beaten in his interrogation, and they publically (sic) desecrated the Qur'an (again). Saad from Kuwait was ERF'd for refusing to go (again) to interrogation because the female interrogator had sexually humiliated him (again) for 5 1/2 hours. Omar the kid from Canada was ERF'd (again) for refusing to go to another illegal interrogation.

Therefore the strike must begin again. Some have already begun – 150 have begun in Camps I, II & III. 60 people in Camp V begin today.

I will begin tomorrow – Friday, August 12th, 2005. I do not plan to stop until I either die or we are respected. People will definitely die.

Bobby Sands petitioned the British Government to stop the illegitimate internment of Irishmen without trial. He had the courage of his convictions and he starved himself to death. Nobody should believe for one moment that my brothers here have less courage – although nobody should believe, either, believe that we are terrorists, or will resort to violence. We take our inspiration, ultimately and exclusively, from our God.

We ask only for justice: treat us, as promised, under the rules of the Geneva Conventions for Civilian Prisoners while we are held, and either try us fairly for a valid criminal charge or set us free.

August 11th, 2005

Binyam Mohammed

# Exhibit H

You have been sent this message from jching@paulweiss.com as a courtesy of
washingtonpost.com

More Join Guantanamo Hunger Strike

By Carol D. Leonnig

   A month-old hunger strike at the U.S. military prison at Guantanamo Bay,
Cuba, has grown to include at least 128 detainees, 18 of whom are forcibly
receiving intravenous fluids or nutrition in the prison hospital, military
officials and detainee lawyers said yesterday.

   The captives are protesting their indefinite imprisonment and what they
describe as beatings administered by the prison's Immediate Response Force
(IRF)-- squads of military personnel who are dispatched to put down
disturbances in detainees' cells. Some have said they will refuse to eat until
the military gives them a fair hearing or they die, according to their
attorneys.

   Military officials first acknowledged the hunger strike, the second of the
summer, on Aug. 25. Since then, the number of people hospitalized and in
serious physical danger has grown to 18, according to Maj. Jeffrey J. Weir, a
Guantanamo Bay spokesman. He said that step was taken to prevent any of the
approximately 520 prisoners at the U.S. Navy base prison from engaging in a
"form of suicide."

The hunger strike began in the first week of August, and, according to newly declassified accounts of detainees provided by their lawyers, has gradually spread across several camps at the prison. Detainees allege they have been severely beaten and are deeply frustrated at their indefinite detentions. Some have been held for 3 1/2 years without facing charges.

. Lawyers for the prisoners assert that more than 200 detainees are refusing food. An earlier hunger strike in June and July ended after military authorities met with a small group of detainees and promised improvements in their living conditions.

"They truly feel they have nothing left," said attorney David Remes, who represents several Yemeni detainees. "I'm not sure what the end point will be. But I do predict there will be death."

Binyam Mohammed, formerly of London, whose account was the first declassified, told his attorney on Aug. 11 of the new hunger strike. "I do not plan to stop until I die or we are respected," he said. "People will definitely die."

Another detainee, Libyan-born Omar Deghayes, told his lawyer he had not eaten in five weeks. "Many more people have fallen unconscious. . . . More are taken to hospital," he said.

Military officials have characterized the protest as a "fast" of prisoners aimed at grabbing attention, and say it involves 128 prisoners. They say its significance is exaggerated by their lawyers.

Weir said no detainees are in danger of dying and that the military's treatment is preventing them from losing critical nutrition. Of the 18 people hospitalized, 13 are being force-fed through nasal tubes and five are being given intravenous hydration.

On Aug. 25, the military said that 89 detainees were fasting and seven were hospitalized and receiving forced fluids or nutrition.

Weir said yesterday that the military does not allow beatings of detainees, and he believes the refusal to eat is part of a campaign to press for their transfer or release.

"My understanding is that it's just because of their continued detention," Weir said. "They're trying to call attention to that."

The majority of detainees at Guantanamo Bay have long insisted that they were captured by mistake by U.S. forces in Afghanistan in the fall of 2001. In some prisoners' cases, records show, the military has little but circumstantial evidence that the men engaged in or supported terrorist acts. The military's review of 558 cases resulted in 38 detainees being declared non-enemy combatants.

The appellate court for the District of Columbia heard arguments last week on the legality of the military holding the detainees indefinitely without giving them the chance to challenge their detentions in a U.S. court -- a follow-up to a U.S. Supreme Court ruling in 2004. But that dispute is expected to drag on until next year, and is likely to be appealed to the Supreme Court again.

Hunger strikes are not new to the prison. Detainees launched one in 2002 after allegations that guards and interrogators mistreated copies of the Koran. Military officials then issued new guidelines for proper treatment of the Islamic holy book, and the strike ended.

Detainees began a new strike in late June to protest their treatment and the quality of their food and water. They complained about solitary confinement, alleged beatings by IRF teams, and the use of uniform colors to signify how detainees should be treated. Detainees given white uniforms are considered cooperative while those assigned orange uniforms are considered uncooperative and treated more harshly, detainees said.

The prisoners halted the previous strike in the first days of August after military camp leaders met with a small "council" of detainees and promised improvements in their living conditions. But the strike resumed a few days later, some detainees told their lawyers, when news spread through the camp of a Tunisian detainee beaten by an interrogator and IRF teams hitting two others, according to detainees' reports to their lawyers.

Weir declined to discuss individual detainees' cases or allegations.

An Algerian detainee told his lawyer in a newly declassified report provided by his attorney that a new interrogator beat the Tunisian with an empty beverage cooler and a metal chair after the detainee refused to talk to him. The Algerian said he saw the Tunisian's bloodied, swollen eye after the session.

Weir declined to comment on those details. Other detainees' accounts of the strike have not yet been declassified by the military, their lawyers said.

Researcher Julie Tate contributed to this report.


Would you like to send this article to a friend? Go to
http://www.washingtonpost.com/ac2/wp-dyn/emailafriend?contentId=AR2005091201690&sent=no&referrer=emailarticle


Visit washingtonpost.com today for the latest in:

News - http://www.washingtonpost.com/?referrer=emailarticle

Politics -
http://www.washingtonpost.com/wp-dyn/content/politics/?referrer=emailarticle

Sports -
http://www.washingtonpost.com/wp-dyn/content/sports/?referrer=emailarticle

Entertainment -
http://www.washingtonpost.com/wp-dyn/content/artsandliving/entertainmentguide/?referrer=emailarticle

Travel -
http://www.washingtonpost.com/wp-dyn/content/artsandliving/travel/?referrer=emailarticle

Technology -
http://www.washingtonpost.com/wp-dyn/content/technology/?referrer=emailarticle

Want the latest news in your inbox? Check out washingtonpost.com's e-mail
newsletters:

http://www.washingtonpost.com/ac2/wp-dyn?node=admin/email&referrer=emailarticl
e

Washingtonpost.Newsweek Interactive
c/o E-mail Customer Care
1515 N. Courthouse Road
Arlington, VA 22201

© 2004 The Washington Post Company

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ABDULSALAM ALI ABDULRAHMAN AL-HELA,** *et al.*, Petitioners, <br><br> *v.* <br><br> **GEORGE W. BUSH, President of the United States,** *et al.*, Respondents. | ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. 05-1048 (RMU)** |
| **SAEED MOHAMMED SALEH HATIM,** *et al.* Petitioners, <br><br> *v.* <br><br> **GEORGE W. BUSH, President of the United States,** *et al.*, Respondents. | ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. 05-1429 (RMU)** |

## DECLARATION OF DAVID H. REMES

Declarant, David H. Remes, comes now upon penalty of perjury and declares that the following is true to the best of his knowledge, recollection and belief:

1. My name is David H. Remes. I am over eighteen years old and am in all respects competent to give this Declaration. This Declaration is submitted in support of Petitioners' Motion to Compel Access to Information Related to Petitioners' Medical Treatment.

2. I am an attorney-at-law licensed to practice in the District of Columbia. I am a partner at the law firm of Covington & Burling. My business address is 1201 Pennsylvania Ave. NW, Washington, DC, 20004.

3.      Covington & Burling represents seventeen Yemeni nationals imprisoned in Guantánamo Bay, Cuba, by the United States. The firm has filed habeas petitions on behalf of these prisoners in the United States District Court for the District of Columbia. The above-captioned cases are pending before Judge Ricardo M. Urbina.

4.      My most recent trips to Guantánamo to interview our clients took place on July 28–August 3 and August 31–September 4. During these visits I met with many of our clients – including each of the petitioners in the *Hatim* and *Al-Hela* cases – and learned about the wide-spread and potentially mortal hunger strikes in the detention facility.

5.      During my visit at the end of July, petitioner Abdulmalik Abdulwahab described his experience during the a hunger strike earlier in the summer: "I passed out 4 times during the hunger strikes – first 3 times was sent to clinic and they forcibly injected me with IV – my heartbeat went to 134 bpm – blood pressure at 155 – blood sugar under 60. I was urinating blood. I was in the best condition of those in the clinic. I went a total of 12–13 days without eating." Mr. Abdulwahab looked gaunt and seemed to have aged years since my last visit. I believe that Mr. Abdulwahab is likely to be participating in the current hunger strike as well.

6.      I believe that one or more of our clients in the above-captioned cases may be engaged in the current hunger strike. During my last visit at the end of August, I observed that Mr. Al-Hela had become strikingly gaunt. I also gleaned from our conversation that he was participating in the ongoing hunger strike.

7.      During both of my two recent visits, I was told by our military escort that several of our clients – whom we have interviewed on many occasions in the past year – refused to meet with my colleagues and me. No explanation for their refusal was provided. We do not

know whether their refusal was related to the current hunger strike.  We do not know whether they have been hospitalized.

8.    On September 10, 2005, my colleague Marc Falkoff sent an email to Andrew Warden at the Department of Justice asking to be notified whether any of our clients were engaged in a hunger strike and whether any had been hospitalized – and if so, to be notified of their condition as soon as possible.  Justice denied the request on September 12, 2005, with the statement that "GTMO is not in a position to provide continuous updates on that situation to you or, potentially, counsel for the more than 200 other habeas petitioners at GTMO."

FURTHER DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 16, 2005.

_____/s/_____
David H. Remes

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------- x

SALIM MOHAMMED ADAM BIN AMIR,      :  Civil Action
                                         No.: 05 CV 01724
                   Petitioner,     :  (RMU)

        -vs-                   :

GEORGE W. BUSH, et al.,

                  Respondents.

-------------------------------------------------------------------- x


## **DECLARATION by GITANJALI S. GUTIERREZ**


I, Gitanjali S.Gutierrez, under penalty of perjury declare that the following statements are true to the best of my knowledge, information and belief:

1.     I am an attorney with the Center for Constitutional Rights, duly licensed to practice law in the State of New York and am of counsel for Petitioner SALIM MOHAMMED ADAM BIN AMIR. The firm of Debevoise & Plimpton LLP is counsel of record for Mr. BIN AMIR. I make this declaration in support of Petitioner AL-OSHAN's Motion to Compel Access to Counsel and for Information Related to Petitioners' Medical Treatment.

2.     Based upon information appearing in the press and upon communications with other counsel representing inmates at the Guantanamo Base in Cuba, I believe that a large number, perhaps the majority, of detainees held therein are participating in a hunger

strike. My client, SALIM MOHAMMED ADAM BIN AMIR, and his "Next Friend," Bisher Al-Rawi, may be included in this group. Respondents themselves or their agents have admitted that at least 131 detainees are participating in this strike.

3.     Through information gathered by communications with other counsel who have visited their clients at Guantanamo who participated in an earlier hunger strike, the detainees have taken this course of conduct to protest abusive and inhumane treatment, lack of proper medical care, and denial of legal process.

4.     I have been granted interim security clearance and have visited Guantánamo Bay Naval Station for attorney visits with other clients prior to representing Petitioner Bin Amir. Because counsel have not yet met with Petitioner BIN AMIR we cannot ascertain the exact status of our client's current medical condition.

5.     The Respondents have not yet filed a Factual Return in response to the *Habeas Corpus* petition counsel filed on behalf of SALIM MOHAMMED ASAM BIN AMIR on August 30, 2005.

6.     For these reasons, I believe it is incumbent upon Respondents to be compelled by an Order of this Court to provide the undersigned with immediate access to both SALIM MOHAMMED ADAM BIN AMIR and his "Next Friend" BISHER AL RAWI, by telephone and in person, and to be provided with information regarding the current status of their health, medical treatment, meal schedules, punishment and hospitalization. Mr. BIN AMIR's other counsel, attorneys at Debevoise & Plimpton

2

LLP, have only recently become involved in these matters and are in the process of submitting their applications for security clearance. Once such applications are granted, one or more attorneys with Debevoise & Plimpton LLP will also seek leave to visit with or telephone Mr. BIN AMIR for the reasons described above, in the event that this matter continues to require the attention of counsel and the Court.

      7.      Time is of the essence.

      WHEREFORE, I join in the motion of AL-OSHAN and respectfully request the Court to grant the relief requested therein.

I declare under penalty of perjury that the forgoing is true and correct.

                              Executed on 16 September, 2005

                              __Gitanjali S. Gutierrez    /s/__

                              GITANJALI S. GUTIERREZ

3

# Exhibit K



"Terry.Henry@usdoj.g
ov" <Terry.Henry

09/09/2005 07:24 PM

To: "APrasow@paulweiss.com" <APrasow@paulweiss.com>
cc:
Subject: RE: Hunger strike

Dear Andrea:

I have conferred with DoD regarding your request for information concerning
the health status of the detainees listed in your September 2 and 6, 2005
e-mails to me. You seek information as to whether any have missed meals for
five days or longer, are in need of medical attention, or have or will be
hospitalized due to participation in a hunger strike.   Alternatively, you
seek telephone access to the detainees.

In addition to the normal quality medical care provided detainees, personnel
at GTMO are actively involved in monitoring the health status of any detainee
who is fasting or participating in a hunger strike. Security personnel monitor
each detainee's daily intake of meals and water. If it is determined that a
detainee has missed all meals over a period of time, typically three days,
though the time is shorter if the detainee is neither eating nor drinking,
medical personnel conduct a medical evaluation of the detainee and then
monitor him on a regular basis. If there is reason to believe that the fast or
hunger strike could endanger the detainee's health, he is admitted to the
detention hospital, where he is monitored, encouraged to eat food and drink
liquids, and counseled on the health risks associated with refusing to eat.
Involuntary medical treatment, such as IV hydration, is administered if the
detainee reaches a point where continued fasting would seriously threaten the
detainee's life or health.

The situation with regard to whether any particular detainee may be missing
meals or is in the detainee hospital is somewhat fluid and may change from
day-to-day. GTMO is not in a position to provide continuous updates on that
situation to you or, potentially, counsel for the more than 200 other habeas
petitioners at GTMO.   Similarly, GTMO is not in a position to support
telephonic access to the detainees for such purposes.  As noted above,
however, GTMO is appropriately monitoring and providing medical treatment to
detainees as warranted to preserve detainees' lives and health.

Sincerely,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

-----Original Message-----
From: APrasow@paulweiss.com [mailto:APrasow@paulweiss.com]
Sent: Friday, September 09, 2005 2:13 PM

To: Henry, Terry (CIV)
Cc: jtarver.PAULWEISS@paulweiss.com; JChing@paulweiss.com
Subject: Hunger strike

Terry,

Please let us know by the end of today if you will inform us of our clients'
medical conditons vis-a-vis the hunger strike and/or allow us telephone access
to them.

Regards,
AJP

This message is intended only for the use of the Addressee and may contain
information that is privileged and confidential. If you are not the intended
recipient, you are hereby notified that any dissemination of this
communication is strictly prohibited. If you have received this communication
in error, please erase all copies of the message and its attachments and
notify us immediately.



**Andrea J Prasow**          To: Terry.Henry@usdoj.gov
09/06/2005 04:46 PM          cc: Julia Tarver/PaulWeiss@PaulWeiss, Jennifer
                                 Ching/PaulWeiss@PaulWeiss
                         Subject: RE: Urgent Information Requested About Detainee Health Status

Terry,

We continue to require information as to whether any of the below-named detainees are in the hospital, or if any of them have refused meals for five days or longer. If it is easier for you, in lieu of confirmation from GTMO personnel, we are available to have telephone calls with each of our clients so that we may ascertain their health status directly. If we do not receive confirmation or telephone access to our clients by the end of the week, we will be forced to seek relief from the Court.

Regards,
AJP

"Terry.Henry@usdoj.gov" <Terry.Henry



**"Terry.Henry@usdoj.g**       To: Andrea J Prasow/PaulWeiss@PaulWeiss
**ov" <Terry.Henry**           cc:
09/02/2005 05:34 PM       Subject: RE: Urgent Information Requested About Detainee Health Status

Andrea,

I need to confer with my client regarding your request for information. Given that it is the holiday weekend, I doubt a response by Sunday afternoon is realistic. As respondents have previously indicated in various filings in the GTMO habeas cases, detainees receive quality medical care, and this would especially be the case with respect to any detainee on a hunger strike.

Regards,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

-----Original Message-----
From: APrasow@paulweiss.com [mailto:APrasow@paulweiss.com]
Sent: Friday, September 02, 2005 2:09 PM
To: Henry, Terry (CIV)
Cc: jtarver@paulweiss.com; JChing@paulweiss.com
Subject: Urgent Information Requested About Detainee Health Status

Terry,

We are aware that a second hunger strike has commenced at Guantanamo. Several of our clients may be affected by this strike, and we urgently need to know whether any of them have been hospitalized. Some of our clients have pre-existing medical conditions that may make them particularly susceptible to health concerns. Please confirm whether any of the following detainees have been or will be hospitalized, or whether they are in serious need of medical attention:

ISN#25  Majid Abdulla al Joudi

ISN#114  Yousif Mohammad Mubarak Al-Shehri

ISN#565  Abdul-Hakim Abdul-Rahman Al-Moosa

ISN#266  Abdulla Mohammad Al Ghanmi

ISN#647  Zaben Dhaher Al Shammari

ISN#42  Abdul Rahman Shalabi

ISN#243  Abdullah Aali Al Otaibi

ISN#13  Fahad Nasser Mohamed

ISN#58  Musa Abed Al Wahab

ISN#497  Nasser Mazyad Al-Subaiy

We appreciate your attention to this matter. Given the urgency of the situation, we would appreciate a response by Sunday afternoon. We are available by email or telephone throughout the weekend.

Regards,
AJP

Andrea J. Prasow | Associate
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3437 (Direct Phone)
(212) 492-0437 (Direct Fax)
aprasow@paulweiss.com | www.paulweiss.com


This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.