*PREVIOUSLY FILED WITH THE CSO*
*AND CLEARED FOR PUBLIC FILING*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-0520 (RMU) |
| NASSER MAZYAD AL-SUBAIY, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1453 (RMU) |
| ABDULSALAM ALI ABDULRAMAN AL-HELA, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1048 (RMU) |
| SAEED MOHAMMED SALEH HATIM, *et al.*, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> GEORGE W. BUSH, *et al.*, <br><br> Respondents/Defendants. | Civil Action No. 05-CV-1429 (RMU) |

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, *et al.*,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br><br>Respondents/Defendants. | Civil Action No. 05-CV-1724 (RMU) |

## PETITIONERS' MOTION TO COMPEL INFORMATION RELATED TO MEDICAL TREATMENT

This motion arises out of the growing hunger strike at the United States military prison in Guantánamo Bay, Cuba ("Guantánamo"). Petitioners in the above-referenced actions, by their undersigned attorneys, respectfully request the Court to compel Respondents to provide counsel access to Petitioners and information regarding Petitioners' health. In support of their application, Petitioners rely upon the following:

### INTRODUCTION

1.      Petitioners are citizens of Sudan, Saudi Arabia and Yemen. Since late 2001 or early 2002, Petitioners have been in the custody of the United States military and held, virtually *incommunicado*, at Guantánamo.

2.      In the past year, Petitioners, by their Next Friends, filed petitions for writs of *habeas corpus*, alleging that their detention is in violation of the Constitution, laws and treaties of the United States.

3.      For well over a month, more than 200 individuals held at Guantánamo have protested both the plethora of abuses perpetrated by Respondents against them, including recent physical beatings, as well as their ongoing detention without charge, by engaging in an open-ended refusal of both food and water.

4.     Emerging details related to the hunger strike provided to Guantánamo *habeas* counsel by their clients, including participants' openly-stated expectation of death, demonstrate that the current situation represents an unprecedented and urgent crisis, with an unconfirmed number of detainees now hospitalized with their health in grave danger.

5.     Rather than acknowledging the crisis and undertaking efforts to provide counsel, Next Friends or family with basic information regarding the health and safety of Petitioners, Respondents have instead claimed to the Court – as recently as two weeks ago, in *Al Odah* v. *United States*, No. 02-0828 (CKK) – that *habeas* counsel's reports regarding the hunger strike were merely "rumor." Faced with numerous media reports and incontrovertible evidence surrounding the crisis, however, Respondents were forced to concede publicly the existence of the hunger strike. *See, e.g.,* Charlie Savage, *89 Prisoners Resume Hunger Strike at Guantánamo*, Boston Globe (Aug. 26, 2005) (containing statements by Army Colonel Brad Blackner confirming that "detainees began fasting to protest their continued detention" on August 8, 2005), attached as Exh. A.

6.     Respondents also admit that, as a result of the deteriorating condition of numerous individuals, the Government has subjected at least some detainees to forced feeding. *See, e.g.,* Mike Mount, *Hunger Strike at Guantánamo Grows*, CNN.com (Sept. 13, 2005) (containing statements of Pentagon officials regarding force feeding), attached as Exh. B. In light of these reports, over the course of the past weeks, counsel for Petitioners in the above-referenced actions have requested information from the Government related to the health and hospitalization of their clients. In response to such requests, counsel for Respondents have refused to provide any client-specific

3

information, claiming instead that the Respondents are "not in a position" to provide updates on whether Petitioners are participating in the hunger strike or in a hospital.

      7.    As set forth in the accompanying affidavits, counsel for Petitioners have either confirmed, or have substantial reason to believe, that their clients are participants in the mass hunger strike. As a result, Petitioners' lives are potentially in grave jeopardy and, despite exceedingly tailored requests by counsel for specific information related to their clients' hospitalization or participation in the hunger strike, Respondents have responded with a blanket refusal to provide any such information or access to Petitioners.

      8.    The Government's response to the current crisis has been wholly inadequate and in violation of accepted American and international standards for treatment of prisoners who elect to participate in a hunger strike. *See, e.g., World Medical Declaration on Hunger Strikers* (Sept. 1992); *American Correctional Health Services Position Statement on Hunger Strikes* (Aug. 1994), attached as Exhs. C and D, respectively.

      9.    Thus, in light of the urgent nature of the issues presented by this application, Petitioners request that the Court grant the following relief:

    a)  Immediate access to Guantánamo by representative counsel to visit with Petitioners and to ensure that they are receiving adequate medical treatment;

    b)  Immediate telephonic access between counsel and clients;

    c)  Telephonic access between counsel, Next Friends, family members and clients;

    d)  Access by counsel to records indicating Petitioners' medical treatment, meal schedules, punishment and hospitalization; and

4

e) Respondents' policies and actions taken with respect to the current and previous hunger strikes.

## FACTUAL BACKGROUND

10.    As publicly conceded by the Government and well-documented in the public record, the detainees at Guantánamo have endured numerous abuses at the direction of United States officers and agents, including torture and interrogation practices which violate both American and international rules governing such conduct.

11.    *Habeas* counsel have received information from clients detailing such abuses, which have included denial of food and water, physical beatings, sexual humiliation, religious violations and prolonged psychological distress.

12.    These abuses have had a profound effect on the mental, physical and emotional state of Petitioners.

13.    On or around August 25, 2005, counsel for Petitioners learned that, as of some two weeks earlier, the second of two recent hunger strikes had commenced at Guantánamo due to detainee complaints that (1) military authorities had failed to meet the obligations agreed to in an agreement between detainees and Respondents that had ended a prior hunger strike just two months ago; (2) detainees continue to be subject to physical, psychological and religious abuses; and (3) detainees continue to be held without charge or adequate process. *See, e.g.,* Declaration of Julia Tarver at ¶ 5 ("Tarver Aff."), attached as Exh. E.

14.    According to recent news reports, Respondents have indicated that the strike involves approximately anywhere from 36 to 131 individuals. *See Hunger Strike Grows in Guantánamo*, Chi. Sun-Times (Sept. 16, 2005), attached as Exh. F.

*Habeas* counsel who have visited the base in recent weeks, however, report that at least 200 individuals are participating in the hunger strike. In support of this statement, counsel have annexed the unclassified statement of detainee and *habeas* petitioner Binyam Mohammed, who reports that the renewed hunger strike involves 210 detainees. *See* Statement of Binyam Mohammed (Aug. 11, 2005), attached as Exh. G (provided by counsel for Mohammed).

15.     The number of participants in the hunger strike has continued to grow on a daily basis. *See* Carol D. Leonnig, *More Join Guantánamo Strike*, Wash. Post (Sept. 13, 2005), attached as Exh. H. In fact, almost forty detainees had joined the strike since last Friday, according to statements made by military officials on September 13, 2005, *see id.*, and an additional eleven detainees have been officially reported as having joined in the past two days. *See* Exh. F.

16.     As time progresses, the health of detainee participants has drastically deteriorated. *Habeas* counsel and news media have reported that, as a result of the strike, twenty-one detainees are currently hospitalized. *See* Exh. F.

17.     Furthermore, Respondents have conceded that, as of September 16, 2005, twenty individuals are being forcibly subject to involuntary medical intervention via the introduction of intravenous fluids or nasoenteric (nasal) tube feeding. *See* Exh. F.

18.     As set forth in the accompanying affidavits, counsel for Petitioners have substantial reason to believe that many, if not all, of their clients are participants in the current strike.

19.     For example, several Petitioners were participants in the early June/July hunger strike, a fact confirmed by counsel who visited with Petitioners during

that time. *See, e.g.,* Tarver Decl. at ¶ 5; Declaration of David H. Remes at ¶¶ 4-5 ("Remes Decl."), attached as Exh. I.

20.     In addition, during the course of the first hunger strike, Petitioner Abdulmalik Adbulwahab, who refused food for 12-13 days, passed out several times, urinated blood and was forcibly injected with intraveneous fluids. *See* Remes Decl. at ¶ 5.

21.     Also during a visit in July 2005, counsel for the *Al-Oshan* and *Al – Subaiy* Petitioners learned that one client had persisted for so long in the hunger strike that he was hospitalized for several days and fed intravenously, during which time he was unconscious for at least four days. *See* Tarver Decl. at ¶¶ 7-8. Upon his awakening, the petitioner, who has been detained since he was a juvenile, was repeatedly visited by individuals purporting to be military officials. *Id.* at ¶ 9. These individuals assured the petitioner that his release had been approved by the Government and would take place in approximately three weeks' time, and, in light of these assurances, the petitioner agreed to end his strike. *Id.* at ¶ 10. As more than six weeks have passed since the Government made these assurances – and Respondents have not yet filed advance notice of any petitioner's release or transfer, as required – it is clear that the Government has reneged on the promise made to the young petitioner. *See id.* at ¶¶12-13.

22.     Counsel for Petitioners, and others, have every reason to believe that their clients are once again participating in the hunger strike, given Respondents' blatant failure to keep the promises they made in order to end the previous strike.

23.     From recent meetings with Petitioner Al-Hela, his counsel believes that he is participating in the current hunger strike. *See* Remes Decl. at ¶ 6.

24. From July meetings with their clients, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners also believe that their clients are participating in the current strike.

25. Counsel have requested information related to Petitioners' health and hospitalization, but Respondents have refused to provide any such client-specific information. *See, e.g.,* Exh. K.

26. On September 2, 2005, for example, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners requested information about whether any clients had been hospitalized or "in serious need of medical attention." *See* Exh. K. Alternatively, counsel requested telephone access to Petitioners to ensure that they were receiving adequate medical attention. *Id.*

27. Despite repeated requests for a timely response, counsel for Respondents did not provide an answer until seven days later, on September 9, 2005. *See* Exh. K.

28. In their response, the Government refused to provide telephone access or any information about Petitioners, stating that "GTMO is not in a position to provide continuous updates" with respect to whether a Petitioner is hospitalized or refusing meals. *See* Exh. K.

29. The Government's response, identical to those received in response to similar requests made by *Al-Hela* counsel, made clear its application to "the more than 200 other habeas petitioners at GTMO." *See* Exh. K; Remes Decl. at ¶ 8.

30. Thus, Respondents have effectively stated that they will not, as a blanket policy, provide any client-specific information to counsel related to a detainee's

refusal to accept food and water or hospitalization resulting from participation in a hunger strike.

## ARGUMENT

31.     This Court may issue preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure to ensure that Petitioners have access to counsel and the Court.[1]   In considering a request for preliminary injunctive relief, the Court must consider four factors:  (1) whether Petitioner would suffer irreparable injury if an injunction were not granted; (2) whether Petitioner has a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest.  *See Al-Fayed* v. *CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001).  "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs, Inc.* v. *Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *City Fed Fin. Corp.* v. *Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).

---

[1]     This Court also has inherent power, under the All Writs Act, 28 U.S.C. § 1651(a), to issue "all writs necessary or appropriate to aid of [its] jurisdiction[] and agreeable to the usages and principles of law."  The Act "empowers a district court to issue injunctions to protect its jurisdiction," *SEC* v. *Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996); *Env'tl. Def. Fund.* v. *EPA*, 485 F.2d 780, 784 n. 2 (D.C. Cir. 1973), and "to achieve the ends of justice entrusted to it." *Adams* v. *United States*, 317 U.S. 269, 273 (1942).  Where "alternative remedies are unavailable," *Clinton* v. *Goldsmith*, 526 U.S. 529, 537 (1999), a court may use the Act to order appropriate relief.

32.     When the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).

33.     Here, counsel for Petitioners seek nothing more than to ensure that Petitioners' most fundamental rights – to bodily integrity, health and safety – are protected.  Counsel cannot ensure such protections.  Respondents, however, have refused to provide counsel with *any* particularized information related to the status of Petitioners. Without the disclosure of information related to Petitioners' status and health, and without immediate access to Petitioners to confer on the current situation, our hands are tied.  As a result, Petitioners request a narrowly-tailored remedy to provide access to counsel so that counsel may understand the particular situations of their clients and provide advice, or undertake action before the Court, as needed.

34.     Without a doubt, the situation presented by Petitioners is extraordinary.  Certainly, counsel cannot present an analogous situation where attorneys would be denied basic information about their clients' health – or access to their clients – if their clients were potentially on the precipice of death.  At the very least, this blanket prohibition by Respondents to provide information and access presents "fair ground[s]" for consideration and investigation by the Court. *See Washington Metro. Area Transit Comm'n*, 559 F.2d at 844.

**(1)**   ***Petitioners face substantial, irreparable harm if immediate relief is not granted.***

        35.    Petitioners will suffer irreparable harm if they are not permitted to have immediate and meaningful access to counsel. Petitioners risk death or permanent physical injury due to their participation in the hunger strike – consequences which may be avoided if they are afforded the opportunity to meaningfully confer with counsel and able to therefore access the Court in order to enforce their rights. No subsequent action by the Court or Respondents can repair that damage. For this reason alone, Petitioners' requested relief should be granted.

        36.    Moreover, any medical intervention that Petitioners are subjected to may deny them their basic right to be informed of and consent to medical care. Loss of these rights cannot later be restored. Access to counsel – and the opportunity to confer and make informed, considered decisions – will allow Petitioners to enforce those rights, if necessary. Without the limited relief requested, Petitioners will suffer serious harm, including possibly death.

**(2)**   ***Petitioners have a substantial likelihood of success on the merits.***

        37.    Courts are empowered to "requir[e] additional measures to assure meaningful access" by *habeas* petitioners "to present their own cases." *Bounds* v. *Smith*, 430 U.S. 817, 824 (1977). Such measures include setting forth affirmative obligations to assure all prisoners meaningful access to the courts. *Id.* Pursuant to this power, in a October 20, 2004 Memorandum Opinion setting forth *habeas* petitioners' access to counsel, Judge Kollar-Kotelly made clear that "the Government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship." Oct. 20, 2004 Memo. Op., *Al-Odah* v. *United States*, No. 02-0828 (CKK). The Court further held

that Respondents may not vitiate Petitioners' right to counsel by imposing restrictions on counsel's access that "inappropriately burden" the attorney-client relationship, *id.* at 9, and that the Court has statutory authority "to craft the procedures necessary" to enforce petitioners' right to counsel so they may "present the facts surrounding their confinement to the Court." *Id.*

      38.    Counsel make this application for emergency relief because the Government has "inappropriately burden[ed]" Petitioners' right of reasonable access to counsel by refusing to provide any information related to Petitioners despite the exigent circumstances presented by the current hunger strike. *See, e.g.,* Declaration of Gitanjali S. Gutierrez, at ¶¶ 4-6 ("Gutierrez Decl."), attached as Exh. J.   By preventing Petitioners from communicating with counsel, the Government has unduly trampled upon the long-held principle affording *habeas* petitioners access to the courts through their lawyers. *See Geders* v. *United States,* 425 U.S. 80, 88-89 (1976) (holding that the right to counsel encompasses the right to confer with one's lawyer). *See also Benjamin* v. *Fraser,* 264 F.3d 175, 186 (2d Cir. 2001) (prison restrictions may violate detainee rights to counsel and access to courts where such restrictions "significantly interfered" with attorney-client interactions); *Borden* v. *Loughren,* 386 F.3d 88, 92 (2d Cir. 2001) (access to counsel is a valid means of providing detainees with access to the courts).

      39.    Indeed, particularly in light of this nation's "strong commitment to human rights and [] clear history of human rights violations against prisoners," courts have long-held that "judicial protection . . . is particularly appropriate and necessary" where prisoners allege abuses and are limited in their access to the courts. *Kane* v. *Winn,* 19 F. Supp. 2d 162, 175 (D. Mass. 2004) ("[E]ven if a [*habeas* petitioner] alleges a sort

of violation that rarely occurs, any generally applicable statutes or other laws must be interpreted in light of the overall level of violations occurring in our prisons." *Id.* at 182).

40.    Thus, without intervention by the Court, Petitioners have no effective means of accessing counsel – and, ultimately, the Court – and therefore no means to address substantial issues related to medical treatment – leaving them "only the right to a meaningless ritual." *Douglas* v. *State of California*, 373 U.S. 353, 358 (1963). Counsel for Petitioners cannot make any informed decisions with respect to Petitioners' health or competency, as well as responsive actions by the Government, without means of immediate access.

41.    Finally, Petitioners note that any stay currently in effect should not prevent the Court from granting the requested relief. *See Ryan* v. *Scibana*, No. 04-C-391-C, 2004 U.S. Dist. LEXIS 22397, at *3 (W.D. Wis. Nov. 3, 2004) (stay pending related appeal lifted because "petitioner will be irreparably harmed if he is forced to wait until the decision is rendered before he can obtain a ruling in this case").   Although the Court entered a stay in the *Al-Oshan, Al-Subaiy*, *Al-Hela* and *Hatim* cases, the Court explicitly provided that a "stay shall not prevent the parties from filing any emergency motion for relief." *See, e.g, Al-Subaiy* v. *Bush*, 05-1453 (Sept. 19, 2005).  As Judge Kessler noted in her decision granting Petitioners the right to seek emergency relief despite the entrance of a stay, "[c]oextensive with the district court's inherent power to stay proceedings is the court's power to craft a stay that balances the hardships to the parties." Mar. 31 Memo. Op., *Al-Joudi* v. *Bush,* No. 05-0520 (GK), (citing *Landis* v. *North American Co.*, 299 U.S. 248, 256 (1936)).

42.    Here, Petitioners request limited remedies that are necessary to address the potentially life-threatening risks at issue. Respondents cannot hide behind the stay as a means of blocking meaningful access to Petitioners. *See In re A.H. Robins Co.*, 828 F.2d 1023, 1026 (4th Cir. 1987) ("Our system of law universally frowns on a party who would use a stay as both a sword and a shield."). The stay does not, and should not, operate to prevent Petitioners access to counsel and the Court when lives are endangered.

**(3)    *Issuing immediate injunctive relief satisfies a strong public interest.***

43.    The public interest in ensuring that Petitioners have access to counsel under the dire circumstances presented here is undoubtedly strong. Without immediate access to counsel, Petitioners' safety and well-being will be jeopardized. Furthermore, counsel cannot provide adequate representation without access to the information related to our clients' treatment and health. Petitioners therefore respectfully request that the Court grant the limited requested relief, as it furthers the significant public interest in ensuring the principles of access to counsel and the Court, as well as the health and safety of individuals held in United States custody.

**(4)    *The relief requested will not injure the Government's interests.***

44.    As a result of Respondents' refusal to provide the requested access and information, and the exigent circumstances presented by the current crisis, counsel for Petitioners come before the Court to request extremely limited emergency relief. Petitioners' request does not substantially injure – or even significantly burden – Respondents' interests.

45.    As the Court is likely well aware, the obstacles already facing Petitioners and counsel are many:

- Visits to Guantánamo require extensive planning and coordination, including security clearance and approvals from the Departments of Justice and Defense, normally at least a month in advance. Extremely limited commercial flights are available for the base.[2] As a result, and given the expenses involved, counsel may only arrange only periodic trips, well in advance, with the Government's approval.

- The Government generally prohibits counsel from communicating with clients via telephone or fax, although the Protective Order, by its terms, permits telephonic access in certain circumstances.

- Delays in attorney-client mail are egregious, with letters often taking well over six weeks to reach clients or counsel.

- Petitioners are regularly denied access to pens or paper for letters to counsel.

- Moreover, Petitioners' compromised health will likely limit their capacity to effectively reach out to counsel for assistance.

- Next friend family members rely almost exclusively upon habeas counsel for timely information about their imprisoned relatives.

46.     In light of the above, Petitioners request narrow remedies which would afford them access to counsel to assist in addressing the issues related to participation in a hunger strike.

47.     *First,* understanding the logistical burden upon both the Government and counsel to arrange for a visit on such short notice, Petitioners request that representative counsel be granted immediate access to Guantánamo, for the purpose of assessing the medical treatment and condition of all Petitioners.[3]

---

[2]     In fact, on certain days of the week, there are no commercial flights to or from Guantánamo, and even when flights are available, space is limited, as the largest aircraft can only hold approximately 15 passengers at a time.

[3]     Such a visit was recently arranged by Respondents in *Al Odah v. United States,* No. 02-0828 (CKK) (in light of hunger strike motion, for emergency access to clients filed).

48. *Second*, counsel for Petitioners request immediate telephone access to their clients to determine their health and well-being, as well as whether they require counsel to take continued legal action to protect their rights.

49. *Third,* Petitioners request telephone access with their Next Friends or family members. Family members may be able to communicate more effectively with Petitioners, who are in a compromised and debilitated medical state.[4]

50. *Fourth,* counsel for Petitioners request access to records regarding Petitioners' medical treatment, meal schedules, punishment and hospitalization, as well as Respondents' policies and actions taken with respect to the current and previous hunger strikes.

51. Counsel for Petitioners also respectfully request a conference before the Court to discuss the issues presented by the within motion.

---

[4] Furthermore, failure to provide families with notice of a detainees' participation in a hunger strike violates World Medical Association (WMA) Guidelines for the Management of Hunger Strikers. *See* Exh. C; *see also* Exh. D.

16

**WHEREFORE**, for the above-stated reasons and for any other reason that may become known to the Court, Petitioners respectfully request the Court grant the above requested relief.

Dated: New York, New York
      September 23, 2005

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:
_____/s/_____

Julia Tarver (NY0029)
Jennifer Ching
Andrea J. Prasow

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Counsel for Petitioners Al-Oshan and*
     *Al-Subaiy, et al.*

**COVINGTON & BURLING**
David H. Remes
D.C. Bar No. 370782
1201 Pennsylvania Ave. NW
Washington, DC 20004
(202) 662-5212

Marc D. Falkoff
D.C. Bar. No. 491149
1330 Avenue of the Americas
New York, NY 10019
(212) 841-1166

*Counsel for Petitioners Al-Hela, et al.*
     *and Hatim, et al.*

**DEBEVOISE & PLIMPTON LLP**
John B. Missing (Bar No. 425469)
Jennifer C. Argabright (Bar. No. 480763)
555 13th Street, N.W. Ste 1100E
Washington, D.C. 20004-1169

(202) 383-8000

Jeffrey I. Lang
Jennifer R. Cowan
Ellen A. Hochberg
Tatia L. Miller
Hadassa Waxman
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Of Counsel*

**CENTER FOR CONSTITUTIONAL RIGHTS**
Barbara Olshansky
Gitanjali Gutierrez
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6439

*Counsel for Petitioners Bin Amir et al.*

18