# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.,* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-520 (RMU) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| NASSER MAZYAD AL-SUBAIY, *et al.,* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1453 (RMU) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| ABDULSALAM ALI ADULRAMAN AL-HELA, *et al.,* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1048 (RMU) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

SAEED MOHAMMED SALEH HATIM,
*et al.*,

          Petitioners,

          v.

GEORGE W. BUSH,
President of the United States, *et al.*,

          Respondents.

Civil Action No. 05-1429 (RMU)

SALIM MOHAMMED ADAM BIN AMIR,
*et al.*,

          Petitioners,

          v.

GEORGE W. BUSH,
President of the United States, *et al.*,

          Respondents.

Civil Action No. 05-1724 (RMU)

MAJID ABDULLA AL JOUDI, *et al.*,

          Petitioners,

          v.

GEORGE W. BUSH,
President of the United States, *et al.*,

          Respondents.

Civil Action No. 05-301 (GK)

|  |  |  |
|---|---|---|
| JARALLAH AL-MARRI, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-2035 (GK) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

|  |  |  |
|---|---|---|
| MUHAMMAD AL-ADAHI, *et al*., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-280 (GK) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

|  |  |  |
|---|---|---|
| HAMID AL RAZAK, *et al*., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1601 (GK) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

```
                                            )
MAHMOAD ABDAH, et al.,                      )
                                            )
                                            )
          Petitioners,                      )
                                            )
          v.                                )       Civil Action No. 04-1254 (HHK)
                                            )
GEORGE W. BUSH,                             )
President of the United States, et al.,     )
                                            )
          Respondents.                      )
                                            )
```

## RESPONDENTS' OPPOSITION TO PETITIONERS' MOTIONS TO COMPEL ACCESS TO COUNSEL AND INFORMATION RELATED TO MEDICAL TREATMENT

Respondents hereby oppose petitioners' various motions to compel in the above-

captioned cases, all of which motions request counsel's immediate in-person and telephonic

access to petitioners and counsel's access to petitioners' medical records and records regarding

respondents' policies pertaining to hunger strikes.[1] Petitioners' motions arise out of reports of

hunger strikes by some detainees at the United States Naval Base at Guantanamo Bay, Cuba and

rest on the faulty and inadequately substantiated premise that the military authorities and medical

staff at Guantanamo are not interested in and are not capable of protecting the health and welfare

---

[1] Petitioners in Al-Oshan v. Bush, Case No. 05-520 (RMU), Al-Subaiy v. Bush, Case No. 05-1453 (RMU), Al-Hela v. Bush, Case No. 05-1048 (RMU), Hatim v. Bush, Case No. 05-1429 (RMU), and Bin Amir v. Bush, Case No. 05-1724 (RMU) jointly filed their revised Motion to Compel Information Related to Medical Treatment (hereinafter "Al-Oshan Motion") on September 23, 2005. Petitioners in Al Joudi v. Bush, Case No. 05-301 (GK), Al-Marri v. Bush, Case No. 04-2035 (GK), Al-Adahi v. Bush, Case No. 05-280 (GK), and Al Razak v. Bush, Case No. 05-1601 (GK) jointly filed their Motion to Compel Access to Counsel and Information Related to Medical Treatment (hereinafter "Al Joudi Motion") with the Court Security Officer on September 19, 2005. Petitioners in Abdah v. Bush, Case No. 04-1254 (HHK) filed their Motion to Compel Access to Medical Information (hereinafter "Abdah Motion") with the Court Security Officer on September 19, 2005. Collectively, the three motions will be referred to as "petitioners' motions."

of detainees participating in a hunger strike, purportedly creating a "crisis" situation.  See Al-
Oshan Motion ¶¶ 7, 8 (asserting that lives are in "grave jeopardy" and that the "Government's
response to the current crisis has been wholly inadequate"); Al Joudi Motion ¶¶ 8, 9 (same);
Abdah Motion ¶ 8 (alleging that a "growing number of detainees are now hospitalized and in
grave condition.").

       Contrary to petitioners' allegations, Guantanamo has carefully established procedures in
place for responding appropriately to hunger strikes that include protocols to intervene to take
medically appropriate measures to preserve detainees' lives and health.  As noted in the sworn
declaration of Major General Jay W. Hood, the Commander of Joint Task Force-Guantanamo
("JTF-GTMO"), security forces at Guantanamo monitor each detainee's daily intake of food and
water.  Declaration of MG Jay W. Hood ("Hood Decl.") ¶ 5 (attached as Exhibit A).  If medical
personnel have reason to believe that the continuation of a hunger strike[2] might endanger the
health of a detainee, the detainee is admitted to the hospital.  Id. ¶ 6.  The detainee is then
encouraged to eat food and drink liquids and is counseled on the health risks associated with
refusing to do so.  Id.  If a detainee continues to refuse to eat or drink and a medical officer
determines that the detainee's health or life might be seriously threatened if treatment is not
promptly administered, Major General Hood will authorize feeding by intravenous means or
through a feeding tube.  Id. ¶ 8.  No detainee at Guantanamo has ever died, from a hunger strike

---

    [2]  A detainee is deemed to have started a hunger strike after missing nine consecutive
meals or after declining food and water for more than two days.  Hood Decl. ¶ 5.  A detainee is
deemed to have ended a hunger strike after eating three consecutive meals.  The number of
detainees engaged in a hunger strike at any given moment thus fluctuates frequently.
At the time of filing this response, there are approximately 30 detainees currently on hunger
strikes at Guantanamo.

or otherwise, since the detentions at issue in the Guantanamo cases began.

As demonstrated in the sworn declaration of Major General Hood, and as explained below, the premise of petitioners' motions – that the government is unwilling to act to preserve detainees' lives and health and that a crisis situation is at hand – is plainly false.  Furthermore, there is no legal basis for the relief sought in petitioners' motions.  Counsel's requests for immediate access to petitioners and to their medical records are merely a prelude to a request for relief that would improperly second-guess the medical care provided by Guantanamo personnel.  As such, counsel's requests are not legally justified in light of the well-establish legal authority requiring courts to accord substantial deference to the judgment of Executive authorities pertaining to the operation of detention facilities and the medical care provided to detainees.  Additionally, the relief requested by petitioners would be unduly burdensome in light of the number of cases in which such relief is sought, as well as likely similar requests by counsel for many other of the well over 200 detainees at Guantanamo with pending habeas cases.  In any event, the relief requested in petitioners' motions is unnecessary in light of previously planned and soon to occur visits, or opportunities for such visits, by most of the counsel involved in these cases, as well as the fact that the health of all detainees, including those on hunger strikes, is carefully managed by the Guantanamo staff.

For these reasons, petitioners' motions should be denied.

**ARGUMENT**

**I.     PRELIMINARY INJUNCTION STANDARD[3]**

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)). Counsel's motions do not meet this extraordinary standard.

**II.     PETITIONERS WILL NOT BE IRREPARABLY INJURED.**

Despite petitioners' attempts to portray a crisis situation among the detainees, petitioners' motions are factually unwarranted and should be denied. No crisis of irreparable harm exists either with respect to detainees' health or counsel's access to their clients. As explained above, Guantanamo personnel have policies and practices in place for responding appropriately to hunger strikes such that no detainee's life or health will be endangered.

With respect to counsel's requests for immediate in-person access to petitioners, court

---

[3] Although the Al Joudi Motion and the Abdah Motion do not explicitly request preliminary injunctive relief, unlike the Al-Oshan Motion which does, the reasons set forth herein for denying the Al-Oshan Motion's request for preliminary injunctive relief apply equally to the Al Joudi Motion and the Abdah Motion, and demonstrate that those motions to compel should also be denied.

intervention is unnecessary in these cases. Counsel for the petitioners in <u>Al-Adahi</u> are currently in the midst of their visit to Guantanamo, which is scheduled to run from September 24, 2005 through September 28, 2005. And counsel for the <u>Al-Oshan</u>, <u>Al-Subaiy</u>, and <u>Al Joudi</u> petitioners are already scheduled to visit their clients at Guantanamo beginning two days from now – from September 29, 2005 through October 3, 2005.[4] Requiring a more immediate visit would be useless and impractical, and these previously scheduled visits obviate any need for court-ordered visits. And counsel for the petitioners in the <u>Abdah</u>, <u>Al-Hela</u>, and <u>Hatim</u> cases recently visited their clients at Guantanamo from August 31, 2005 through September 4, 2005, while hunger strikes were ongoing. These same counsel also had another visit scheduled for September 14, 2005 through September 18, 2005, but they voluntarily canceled that trip just a few days before filing the instant motions. They should not now be entitled to obtain an immediate court-ordered visit. In any event, these counsel are free to schedule another visit to Guantanamo by providing the typical twenty-day advance notice.[5] <u>See In re Guantanamo</u>

---

[4] With respect to the <u>Bin Amir</u> case, No. 05-1724 (RMU), granting the relief requested by counsel in that case would be improper in light of the fact that petitioner Salim Mohammed Adam Bin Amir, through separate counsel, previously filed a duplicate habeas petition in <u>Adem v. Bush</u>, No. 05-723 (RWR). <u>See</u> Notice of Multiple Petitions Filed By Guantanamo Bay Detainee in <u>Bin Amir v. Bush</u>, No. 05-1724 (RMU) (dkt. no. 3) (Sept. 23, 2005). Accordingly, the <u>Bin Amir</u> case should be dismissed and any issues regarding the relief requested should be decided in the <u>Adem</u> case. In addition, lead counsel for petitioner in <u>Bin Amir</u> has yet to obtain a security clearance necessary to permit a visit to Guantanamo Bay.

With respect to the <u>Al Razak</u> case, No. 05-1601 (GK), granting the relief requested by counsel in that case would be improper in light of the fact that respondents have filed a motion for order to show cause why the case should not be dismissed for lack of proper "next friend" standing. <u>See</u> Respondents' Motion for Order to Show Cause in <u>Al Razak v. Bush</u>, No. 05-1601 (GK) (dkt. no. 2) (Aug. 31, 2005). Counsel for petitioner Al Razak, similarly, has yet to obtain a security clearance necessary to permit a visit to Guantanamo Bay.

[5] Counsel for the <u>Al-Marri</u> petitioners did not request a visit prior to filing their motion; they, too, are free to request meetings with their clients at Guantanamo. In the normal course,

Detainee Cases, 344 F. Supp. 2d 174, 186 (D.D.C. 2004) (publishing November 8, 2004

protective order, which indicates that counsel visits generally require twenty days advance

notice).  Moreover, immediate counsel visits are not necessary in any of these cases because the

health and welfare of the detainees, including those on hunger strikes, are sufficiently maintained

by the Guantanamo staff, as discussed previously and clearly established in General Hood's

declaration.  Consequently, petitioners have not demonstrated that they will suffer irreparable

harm and their motions should be denied.

**III.     THE REQUESTED RELIEF WOULD IMPOSE UNDUE BURDENS ON THE
            GOVERNMENT AND INJURE ITS INTERESTS.**

In addition to being unnecessary, requiring immediate in-person access by counsel to all

of the petitioners in these cases would impose an unmanageable burden on the staff at

Guantanamo.  Arranging for attorneys to meet with their detainee clients at Guantanamo is a

significant and time-consuming undertaking.  In order to facilitate counsel visits, counsel must

be lodged on the base, and petitioners must be moved from the detention areas to meeting

facilities in a separate but physically limited area of Guantanamo known as "Camp Echo."  Each

movement of each detainee to and from Camp Echo requires a number of logistical and security

measures, including orders from military supervisors to move the detainee, arrangements for

vehicular transport, and arrangements for multiple guards and support personnel for the

movement of the detainee, his personal belongings, and for the delivery of meals.  These

arrangements must be orchestrated with other operational functions and duties at Guantanamo,

including, but not limited to, daily meals, multiple daily prayer calls, exercise opportunities, and,

---

visits are typically scheduled within a few weeks from the time they are requested, eliminating
any need for court intervention for the purpose of scheduling various counsel visits.

where appropriate, military commission proceedings and witness interviews.  Thus, while done

frequently – indeed, virtually daily in recent weeks – counsel visits can be accommodated for

only a few attorneys at any given time and therefore require several weeks advance notice for

scheduling.  As a result, arranging an immediate counsel visit, especially for six different

counsel groups on behalf of the thirty-four detainees involved in these cases, with little or no

prior notice, would be extremely difficult to accomplish and accommodate.[6]  Moreover,

counsel's requests for immediate visits in the present case cannot be viewed in isolation, as any

order granting such relief would likely cause counsel for many detainees in other cases to

demand immediate access to their clients as well.[7]  Arranging immediate counsel visits in these

cases, let alone in well over a hundred different cases involving more than a hundred different

attorneys and over two hundred different detainees, simply because the attorneys think that some

of their clients might be on a hunger strike clearly would pose an undue burden on respondents

and would be imprudent and unwarranted, particularly in the face of declarations demonstrating

that competent staff at Guantanamo Bay have procedures in place which they apply to care for

the health and lives of the detainees.[8]

---

[6]  In support of their motions, petitioners' counsel refer to a recent visit arranged for counsel in Al Odah v. United States, Case No. 02-828 (CKK).  See Al-Oshan Motion ¶ 47 n.3; Al-Joudi Motion ¶ 36 n.2.  The Al Odah counsel visit, however, was scheduled only slightly inside the normal twenty-day advance notice period for counsel visits and was able to be fully accommodated only because the Abdah counsel group had recently canceled its previously arranged visit for that same time period.

[7]  Indeed, respondents have already begun to receive such requests from counsel for other detainees.

[8]  For these same reasons, the Guantanamo staff cannot provide counsel continuous updates on the health status of every individual detainee and whether a certain detainee is participating in a hunger strike at any given moment.  As explained previously, supra n.2, the situation can be fluid in light of the fact that detainees may consume or forgo a meal at any time

Counsel's request for telephone access to the petitioners and phone calls between petitioners and their family members would similarly impose substantial and unnecessary burdens on Guantanamo operations. In many ways the logistics of arranging a telephone conversation between the detainees and habeas counsel or family members are more burdensome than a direct counsel visit because the detainees must be moved to a location not typically used for holding detainees even temporarily (e.g., an office in an administration building) where a secure classified information international telephone line is available. The appropriate security procedures required to complete such a movement of detainees and ensure force protection to Guantanamo personnel far exceed the typical movement of detainees from the detention area to Camp Echo for purposes of counsel visits. For example, in addition to making all of the detainee moves needed for an in-person visit, electronic, physical, and personnel arrangements would have to be made in order to both allow secure but confidential communication with counsel and secure but monitored communication with family members. See In re Guantanamo Detainee Cases, 344 F. Supp. 2d 174, 190 (D.D.C. 2004) (publishing November 8, 2004 protective order, which provides that "[a]ny telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording" and "[a]ny telephonic access by persons other than counsel will be subject to appropriate security procedures, including contemporaneous monitoring and recording."). Such a burden would be

---

and may receive inpatient or outpatient treatment. Some detainees may not be missing any meals; some detainees may be skipping a few meals but not enough to be considered on a hunger strike; some detainees may be on a hunger strike but not require hospitalization; some detainees may require hospitalization on an outpatient or inpatient basis; and some detainees may require involuntary feedings. A detainee's status may fluctuate among these categories. Accordingly, providing petitioners' counsel continuous reports on the health and hunger strike status of each detainee would be an overwhelming and unnecessary burden for Guantanamo staff members.

multiplied many times over in light of the hundreds of other detainees who would request similar phone privileges. These incredibly burdensome requirements form an important part of the Revised Procedures for Counsel Access stating the over-arching premise that "[r]equests for telephonic access to the detainee by counsel or other persons will not normally be approved." Id. Accordingly, petitioners' request for telephone access to counsel and family members is unduly burdensome and should be denied.

Additionally, petitioners' counsel can cite to no legal authority requiring the government to communicate with family members of any hunger-striking detainees about their condition and medical treatment. See, e.g., Lamkey v. Roth, 1995 WL 516587 *1 (N.D. Ill. 1995) (concluding that prison warden's failure to notify prisoner's mother when prisoner was admitted to hospital for intestinal problems "does not rise to the level of a constitutional violation. No principle of federal constitutional law requires that notice be given to a sick inmate's family."). Petitioners do not provide any support for the proposition that hunger-striking prisoners must have direct communications with family members as a matter of law. Indeed, as discussed, such communications would present very real logistical as well as security problems.[9] In any event, Guantanamo officials have previously permitted petitioners' counsel to deliver written family communications to petitioners in conjunction with counsel visits to Guantanamo, subject to advance security review in accordance with the terms of the Court's November 8, 2004 Amended Protective Order governing counsel access. A number of petitioners' counsel have

_____

[9] Petitioners' next-friends and family members do not have security clearances, and any monitoring of such calls by Guantanamo personnel, see In re Guantanamo Detainee Cases, 344 F. Supp. 2d at 190 (publishing November 8, 2004 protective order, which permits monitoring and recording of calls between detainees and persons other than counsel), would only increase the logistical burdens on the government resulting from such calls.

availed themselves of this process during their previous visits to Guantanamo, and they may

continue to do so consistent with the Amended Protective Order during future visits where

circumstances may warrant.[10]

Petitioners' additional request for access to their medical records and other records

pertaining to hunger strikes, see Al-Oshan Motion ¶ 50; Al Joudi Motion ¶ 39; Abdah Motion ¶

29(c), is an improper attempt to take discovery that would also be unduly burdensome and, in

any event, is unnecessary. A petitioner in a habeas case is not entitled to discovery as a matter of

right, but rather must first demonstrate good cause to conduct discovery and obtain court

permission. See, e.g., Rich v. Calderon, 187 F.3d 1064, 1068 (9th Cir. 1999) (explaining that

"[a] habeas petitioner does not enjoy the presumptive entitlement to discovery of a traditional

civil litigant," and that "discovery is available only in the discretion of the court and for good

cause shown."); Al Odah v. United States, 329 F. Supp. 2d 106, 107-08 (D.D.C. 2004) (finding

that Guantanamo detainee habeas petitioners must first seek leave of court before conducting

discovery and denying leave to conduct discovery); cf. Rule 6(a) of the Rules Governing Section

2254 Cases[11] (requiring leave of court for good cause shown before discovery may be

conducted). Petitioners have not requested leave of court to take discovery, and the Court should

not permit them to evade this requirement simply by filing their motions to compel. Discovery

---

[10] Furthermore, in light of several counsel's current and forthcoming visits to
Guantanamo and the procedures in place to monitor, advise, and treat petitioners engaged in
hunger strikes, phone calls between petitioners and their counsel or family members are not
necessary.

[11] The Rules Governing Section 2254 Cases can apply to other habeas corpus petitions,
including habeas petitions, such as the present ones, brought under 28 U.S.C. § 2241. See Rule
1(b) of the Rules Governing Section 2254 Cases.

should be particularly disfavored in the present cases, where petitioners challenge the military's conduct of a war overseas and such discovery would interfere with military operations. <u>See Hamdi v. Rumsfeld</u>, 124 S. Ct. 2633, 2652 (2004) (plurality opinion) (adjuring lower courts generally to "proceed with the caution that is necessary" and to take only "prudent and incremental" steps when faced with novel issues pertaining to petitions for writs of habeas corpus from detainees involved in the current war on terror).

Furthermore, access to petitioners' medical records is not necessary, and petitioners cannot demonstrate good cause for their production, because Major General Hood has indicated that the Guantanamo staff carefully monitors the daily intake of food and water for each detainee and will intervene, if necessary, to take medically appropriate measures to preserve the lives and health of any Guantanamo detainees participating in a hunger strike. <u>See generally</u> Hood Decl.[12] Clearly, the only purpose for counsel's request for petitioners' medical records is to invite the Court to second-guess the medical treatment provided by the Guantanamo medical staff, which, as explained below, is improper. Accordingly, there is no need for petitioners' counsel to access petitioners' medical or other related records and their request should be denied.

Finally, an order requiring the production of petitioners' medical records would impose a tremendous burden on the Guantanamo staff, because each record would require review[13] and, as with the burdens associated with counsel visits and phone calls, the burden of producing medical

---

[12]  As explained, respondents' policies and actions taken in response to hunger strikes are summarized in Major General Hood's attached declaration, obviating any need for petitioners' access to records pertaining to those policies.

[13]  There is also a question of whether any petitioner who has not yet directly authorized counsel to represent him in these cases may have some privacy interests that would have to be protected prior to the production of such medical records.

records should not be assessed merely within the confines of the petitioners in the present cases,

because hundreds of other detainees are likely to request such records if the Court orders such

relief here, thus multiplying the onus on the Guantanamo staff exponentially.  As demonstrated,

the relief requested by petitioners is unnecessary and, at the same time, would substantially

injure the interests of respondents and therefore should be denied.

## IV.    PETITIONERS ARE NOT LIKELY TO SUCCEED BECAUSE THERE IS NO ADEQUATE LEGAL BASIS FOR THE RELIEF PETITIONERS REQUEST.

In addition to lacking a justifiable factual basis (as demonstrated by the sworn declaration

of Major General Hood), petitioners' motions lack an adequate legal basis for their requested

relief.  Petitioners' counsel's requests for immediate access to the petitioners and records relating

to petitioners' medical treatment and meal schedules, as well as records regarding the military's

policies and actions taken pertaining to hunger strikes, indicate that petitioners ultimately seek

judicial intervention and oversight of the medical care provided by Guantanamo to hunger-

striking detainees.  Petitioners' requests for such access and information can serve no other

purpose than to facilitate second-guessing of the judgment of the military's medical

professionals.

To the extent that such conditions of confinement claims are even cognizable in habeas

proceedings,[14] there is no compelling legal basis for judicial supervision of petitioners' medical

_____

[14]  The Supreme Court and the D.C. Circuit have never squarely resolved whether challenges to conditions of confinement may be brought under habeas proceedings.  See Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979) ("Thus, we leave for another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement itself."); Brown v. Plaut, 131 F.3d 163, 168-69 (D.C. Cir. 1997) (acknowledging that habeas corpus might conceivably be used to challenge prison conditions, but indicating that requiring use of habeas corpus in such cases would extend the writ beyond its core).  Courts in other jurisdictions that have squarely addressed the issue,

care.  As a threshold matter (and assuming detainees have constitutional rights, a matter

currently before the Court of Appeals),[15] courts have routinely denied constitutional challenges

to the involuntary feeding of hunger-striking prisoners.  See, e.g., Grand Jury Subpoena John

Doe v. United States, 150 F.3d 170, 172 (2d Cir. 1998) ("we, like the majority of courts that

have considered the question, hold that [an involuntary feeding] order does not violate a

hunger-striking prisoner's constitutional rights"); Martinez v. Turner, 977 F.2d 421, 423 (8th

Cir. 1992) ("Martinez's claim that he was force-fed also fails to state a constitutional claim."); In

re Soliman, 134 F. Supp. 2d 1238, 1255 (N.D. Ala. 2001) ("Federal courts generally have

approved of force-feeding hunger striking inmates, regardless of whether the person was a

convicted prisoner, a pre-trial detainee, or a person held pursuant to a civil contempt order"),

vacated as moot, 196 F.3d 1237 (11th Cir. 2002).  None of these cases even suggests that courts

have a role in supervising the government's medical treatment of hunger-striking detainees.

And, as a general matter, the Supreme Court has explained that the operation of even domestic

"correctional facilities is peculiarly the province of the Legislative and Executive Branches of

our Government, not the Judicial," and has admonished lower courts to avoid becoming

"enmeshed in the minutiae of prison operations."  Bell v. Wolfish, 441 U.S. 520, 548, 562

---

however, have affirmatively held that conditions of confinement claims that do not seek
accelerated release from custody are not within the scope of the writ of habeas corpus.  See, e.g.,
Cochran v. Buss, 381 F.3d 637, 639 (7th Cir. 2004); Carson v. Johnson, 112 F.3d 818, 820-21
(5th Cir.1997);  McIntosh v. United States Parole Commission, 115 F.3d 809, 811-12 (10th Cir.
1997); Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991).

        [15]  The assumption that detainees have constitutional rights, which respondents contest,
pertains to the entire ensuing discussion regarding the legal standards that apply to those rights.
As demonstrated infra, even assuming the existence of such rights, petitioners are not entitled to
the relief requested.

(1979); see also Inmates of Occoquan v. Barry, 844 F.2d 828, 841 (D.C. Cir. 1988) ("courts are

not to be in the business of running prisons"). This is especially the case in the area of medical

care. See, e.g., Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)

(stating that federal courts will "disallow any attempt to second-guess the propriety of a

particular course of treatment" chosen by prison doctors); Martinez v. Mancusi, 443 F.2d 921,

924 (2d Cir. 1971) ("Obviously, courts cannot go around second-guessing doctors."). These

concerns are certainly heightened in the unique and unprecedented context of these cases –

involving the military detention of alien enemy combatants overseas during a time of war.

        Beyond this, because no court has ever determined that detainees of the military can even

bring conditions of confinement claims, no court has determined what legal standard should be

applied to evaluate such claims brought by detainees in the custody of the military. Cf. O.K. v.

Bush, 377 F. Supp. 2d 102, 112 n.10 (D.D.C. 2005) ("No federal court has ever examined the

nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of

war context."). The Supreme Court has explained that constitutional challenges to conditions of

confinement brought by convicted criminals are analyzed under the Eighth Amendment's

"deliberate indifference" standard, which requires a prisoner to establish that prison officials

"were knowingly and unreasonably disregarding an objectively intolerable risk of harm to the

prisoners' health or safety."[16] Farmer v. Brennan, 511 U.S. 825, 834-35, 846 (1994); see also

_____

        [16] This standard is applicable both to claims alleging inadequate medical care as well as
challenges to general conditions of confinement, such as inadequate food, clothing, and cell
temperature. See Wilson v. Seiter, 501 U.S. 294, 303 (1991) ("Whether one characterizes the
treatment received by the prisoner as inhumane conditions of confinement, failure to attend to
his medical needs, or a combination of both, it is appropriate to apply the 'deliberate
indifference' standard articulated in Estelle [v. Gamble, 429 U.S. 97 (1976)]"). The two-prong
deliberate indifference test requires the moving party to establish first that "the deprivation

Ingram v. Wright, 430 U.S. 651, 664 (1977) (holding that the Eighth Amendment applies only to "those convicted of crimes"). In contrast, the constitutional standard of care owed to "pretrial detainees" in the criminal justice context – defined by the Supreme Court as "those persons who have been charged with a crime but who have not yet been tried on that charge" – is governed by the Due Process Clause of the Fifth Amendment. Bell v. Wolfish, 441 U.S. 520, 523, 536 (1979). "[W]here it is alleged that a pretrial detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment, for under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law."[17] Block v. Rutherford, 468 U.S. 576, 583 (1984) (internal quotations omitted); see also Brogsdale v. Barry, 926 F.2d 1184, 1188 n.4 (D.C. Cir. 1991).

Regardless of whether either of these two standards directly applies to the Guantanamo detainees,[18] prison administrators are entitled to great deference regarding the ways in which

---

alleged must be, objectively, sufficiently serious, . . . a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; second, a prison official must have a "sufficiently culpable state of mind" – "one of deliberate indifference to inmate health or safety." Farmer, 511 U.S. at 834 (internal quotations omitted).

[17] Although the Supreme Court has never resolved the precise relationship between these two tests, see City of Canton v. Harris, 489 U.S. 378, 389 n.8 (1989) (reserving "whether something less than the Eighth Amendment's 'deliberate indifference' test may be applicable in claims by [pretrial] detainees asserting violations of their due process right to medical care while in custody"), the Court has explained that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner." County of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998).

[18] Petitioners have not been convicted of any crime, and thus cannot rely on the Eighth Amendment as a basis for their conditions of confinement claims, see In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 465-78 (D.D.C. 2005) (dismissing Eighth Amendment claims), and they also are not "pretrial detainees," as defined by the Supreme Court, because they have not been charged with a crime, nor are they being detained as part of the criminal

they manage prisons and the means used to care for and detain prisoners. One court has

employed the deliberate indifference standard as a guide for its evaluation of a Guantanamo

detainee's claim of deficient medical care. O.K. v. Bush, 344 F. Supp. 2d 44, 60-63 & n.23

(D.D.C. 2004) (Bates, J.) ("Without concluding that the 'deliberate indifference' doctrine

applies" to challenges regarding inadequate medical care, "the Court will draw on this

well-developed body of law to guide its analysis"). Under that standard, only upon a showing

that prison conditions or care sink to the level of "deliberate indifference" to an inmate's health

or well-being is a court justified in intervening in the treatment of inmates in the traditional penal

prison setting. See Neitzke v. Williams, 490 U.S. 319, 321 (1989); Chandler v. District of

Columbia Dept. of Corrections, 145 F.3d 1355, 1360 (D.C. Cir. 1998) ("To prevail in a case

alleging unconstitutional conditions of confinement, a prisoner must show that the government

official 'knew of and disregarded an excessive risk to inmate health or safety"). And, as noted

above, "second-guessing" medical care decisions is not permissible. See, e.g., Pierce, 612 F.2d

at 762. These same principles counsel the Court to decline petitioners' request to begin to

---

justice system. Cf. Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2640 (2004) (plurality opinion)
(detention of enemy combatants is not punishment or penal in nature); Padilla v. Hanft, 2005 WL
2175946 at *6 (4th Cir. Sept. 9, 2005) (distinguishing criminal detention from military detention
of enemy combatants). Furthermore, the criminal justice interests served by confining "pretrial
detainees" are completely distinct from the military and national security interests served by
detaining individuals, such as petitioners, in conjunction with ongoing hostilities. Compare
Wolfish, 441 U.S. at 536-37 (criminal justice interest served by pretrial detention is to ensure
detainees' presence at trial), with Hamdi, 124 S. Ct. at 2640 (2004) (plurality opinion) ("The
capture and detention of lawful combatants and the capture, detention, and trial of unlawful
combatants is to prevent captured individuals from returning to the field of battle and taking up
arms once again."). The uncertainty of the law in this area is illustrated by the fact that one
Judge of this Court who has addressed the issue of a condition of confinement claim by a
Guantanamo detainee reserved the question whether "the 'deliberate indifference' doctrine is the
correct standard for any constitutional claims that petitioners might raise in this case." O.K. v.
Bush, 344 F. Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) (Bates, J.).

entangle itself in unspecified ways into the particulars of their medical care and the military's response to hunger strikes by ordering counsel's and family members' immediate access to petitioners and their medical records.  Indeed, in light of the fact that petitioners are challenging the practices of a military detention center during a time of war, separation of powers principles may require satisfaction of an even more stringent standard before judicial intervention is warranted than in the penal context.[19]

In any event, petitioners cannot satisfy even the "deliberate indifference" standard that would apply in the penal context.  The record demonstrates that any detainee engaged in a hunger strike receives sufficient monitoring and medical attention, and the Guantanamo medical staff has intervened and will continue to take medically appropriate measures to preserve the lives and health of detainees as needed.  As noted, the declaration of Major General Hood explains that Guantanamo personnel have policies and practices in place for responding appropriately to hunger strikes, which include protocols for the close monitoring of each detainee's daily intake of food and water, counseling regarding the risks associated with participating in a hunger strike, hospitalization when a detainee's health is impaired, and

---

[19] See, e.g., Hamdi, 124 S. Ct. at 2647 (plurality opinion) (stating that "[w]ithout doubt, our Constitution recognizes that core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them"); id. at 2640 (noting that capture and detention of suspected combatants is an "important incident of war"); Ludecke v. Watkins, 335 U.S. 160, 170 (1948) (finding that determination of state of war and status of individual as enemy alien are "matters of political judgment for which judges have neither technical competence nor official responsibility"); cf. Hirota v. MacArthur, 338 U.S. 197, 215 (1949) (Douglas, J., concurring) (stating that "the capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander-in-Chief, and as spokesman for the nation in foreign affairs, had the final say."); Khalid v. Bush, 355 F. Supp. 2d 311, 328 (D.D.C. 2005) (explaining that management of wartime detainees' confinement conditions is the province of the Executive and Legislative branches, thus precluding judicial scrutiny of such conditions).

administration of involuntary feedings when necessary to maintain a detainee's life and health. Hood Decl. ¶¶ 5, 6, 8.  These policies and care have already been applied with respect to detainees who have participated in a hunger strike, and will continue to be applied to any detainees, including petitioners, who might choose to engage in a hunger strike in the future. Accordingly, there is no factual or legal basis for Court supervision of petitioners' medical care, or for counsel's immediate access to petitioners and their medical records for these purposes.

## V.    DENYING PETITIONERS' MOTIONS WOULD BEST SERVE THE PUBLIC INTEREST.

The public has a strong interest in assuring that the military operations and medical care provided at Guantanamo are not interrupted, overly burdened, and second-guessed by the unnecessary demands of petitioners' counsel for immediate access to the detainees and their medical records.  Petitioners depend primarily on the public's asserted interest in ensuring that petitioners have access to counsel to support their motions.  See Al-Oshan Motion ¶ 43.  As demonstrated above, however, petitioners do, in fact, have adequate access to their counsel, especially in light of the current and impending counsel visits.  Thus, the public's purported interest in petitioners' access to counsel is already being well-served without court intervention. Accordingly, to avoid the unnecessary burdens imposed by petitioners' motions, the public interest would best be served if the Court denied the petitioners' motions.

## CONCLUSION

For the reasons stated above, respondents respectfully request that petitioners' motions be denied in all respects.

Dated: September 27, 2005                    Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             KENNETH L. WAINSTEIN
                                             United States Attorney

                                             DOUGLAS N. LETTER
                                             Terrorism Litigation Counsel

                                             ___/s/ Edward H. White_____
                                             JOSEPH H. HUNT (D.C. Bar No. 431134)
                                             VINCENT M. GARVEY (D.C. Bar No. 127191)
                                             TERRY M. HENRY
                                             JAMES J. SCHWARTZ
                                             PREEYA M. NORONHA
                                             ROBERT J. KATERBERG
                                             ANDREW I. WARDEN
                                             NICHOLAS J. PATTERSON
                                             EDWARD H. WHITE (D.C. Bar No. 468531)
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W.
                                             Washington, DC  20530
                                             Tel:  (202) 514-4107
                                             Fax:  (202) 616-8470

                                             Attorneys for Respondents

-19-