UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~   1

FILED WITH THE
COURT SECURITY OFFICE
CSO: MURKISN
DATE: 12 15 09

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAEED MOHAMMED SALEH HATIM *et al.*, | : | |
| | : | |
| Petitioners, | : | Civil Action No.:   05-1429 (RMU) |
| | : | |
| v. | : | Re Document No.:   1 |
| | : | |
| BARACK OBAMA *et al.*, | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM OPINION

### GRANTING PETITIONER HATIM'S PETITION FOR WRIT OF HABEAS CORPUS

### I. INTRODUCTION

The petitioner, Saeed Mohammed Saleh Hatim ("petitioner Hatim" or "the petitioner"), has been detained at the Guantanamo Bay Naval Base in Cuba ("GTMO") for over seven years based on the government's suspicion, heretofore untested in any domestic court, that he acted as part of the al-Qaida apparatus in Afghanistan. More than three years after his capture and transfer to GTMO, the petitioner filed a petition for writ of habeas corpus challenging the legality of his detention and asking the court to order him released forthwith to his home in Yemen. Since filing his petition, he has remained behind bars for over four years while this court, the Circuit and the Supreme Court have grappled with various novel issues raised by the GTMO detainee litigation. Not all of the questions raised in this wave of litigation have been answered yet; but the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), clearly ruled that the court has jurisdiction to consider the detainees' habeas petitions, prompting the court to begin to rule on the merits of the petitions. Thus, nearly eight years after his capture, the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET~~

court conducted a hearing on the petitioner's claim of unlawful detention on August 17 and 18,

2009, and the matter is now ripe for resolution.

The government contends that the petitioner "trained with, lived with, operated under the

command of, and worked for al-Qaida and Taliban forces and their affiliates." Govt's Mot. for J.

on the R. at 1. More specifically, the government alleges that the petitioner (1) trained at an al-

Qaida terrorist camp, *id.* at 27-29; (2) stayed at al-Qaida and Taliban-affiliated safehouses and

███████████████████████████████████████████████████████ (3)

operated under the command of al-Qaida and the Taliban at the battlefront against the Northern

Alliance, *id.* at 30-31; (4) ████████████████████████████

████████████ and (5) was identified by a witness as having fought in the battle of Tora Bora

against the United States and its coalition partners, *id.* at 32-34.

The government's allegations rest almost entirely upon admissions made by the petitioner

himself – admissions that the petitioner contends he made only because he had previously been

tortured while in U.S. custody. Significantly, the government does not contest the petitioner's

claims of torture; rather, it argues that the court should credit the petitioner's statements

notwithstanding those claims. The government's justification for detention also rests heavily on

a third-party identification by a GTMO detainee whose reliability has been seriously called into

question by the court as well as by GTMO intelligence officers.

Upon consideration of the record, the parties' extensive submissions and the arguments

presented during the merits hearing, the court concludes that the government has failed to

persuade the court that the petitioner's detention is lawful. Accordingly, the court grants the

petition for writ of habeas corpus.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

## II. FACTUAL & PROCEDURAL BACKGROUND

The petitioner, a 33-year-old citizen of Yemen, was captured in Pakistan in or about November 2001. Govt's Mot. for J. on the R. at 4. █████████████████ ███████████████████████████ and has been held at GTMO since June 2002, *see* Traverse at 8. He filed his habeas petition on July 20, 2005. *See generally* Habeas Pet. Because related cases awaited resolution by the Circuit on appeal at that time, *see generally Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005); *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), the court granted the government's motion to stay the proceedings, *see* Mem. Order (Aug. 22, 2005). Insofar as they pertain to this case, the related cases were resolved by the Supreme Court's decision in *Boumediene*, 128 S. Ct. 2229, in which the Court held that, pursuant to the Suspension Clause of the Constitution, the GTMO detainees were "entitled to the privilege of habeas corpus to challenge the legality of their detention," *id.* at 2262, and that the federal district courts have jurisdiction to hear such challenges, *id.* at 2274.

Although the Court did not specify what procedures the district courts were to employ in resolving these cases, it did emphasize that the "detainees in these cases are entitled to a prompt habeas corpus hearing." *Id.* at 2275. Toward that end, this court and other judges in this district agreed to consolidate their cases before then-Chief Judge Hogan for the purpose of adopting common procedures for the GTMO detainee litigation. On November 6, 2008, Judge Hogan issued a Case Management Order ("CMO") to govern these proceedings, which he amended on December 16, 2008. *See generally* Am. CMO (Dec. 16, 2008). This court adopted the provisions of the amended CMO, subject to modifications set forth in the Supplemental Order of November 10, 2008 and the Omnibus Order of April 23, 2009. *See generally* Supplemental Order (Nov. 10, 2008); Omnibus Order (Apr. 23, 2009).

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Meanwhile, having filed its initial Factual Return in 2005, the government filed a motion

to amend its Factual Return, which Judge Hogan granted on November 7, 2008. *See* Order (Nov.

7, 2008). The petitioner filed his Traverse on May 26, 2009. *See* Traverse. Throughout this

period, the parties engaged in extensive discovery. The court then held a merits hearing on

August 17 and 18, 2009. The parties filed proposed findings of fact and conclusions of law

shortly thereafter. *See* Petr's Proposed Findings of Fact & Conclusions of Law; Govt's Proposed

Findings of Fact & Conclusions of Law.


## III. ANALYSIS

Before addressing the merits of the petitioner's habeas claim, it is useful for this court to

address two preliminary issues: (1) the legal standard that governs the court's determination of

whether the petitioner's detention is lawful; and (2) the admissibility of, and weight to be

afforded to, hearsay evidence.

### A. Standard of Detention

The CMO issued by Judge Hogan and adopted in relevant part by the court establishes

that "the government bears the burden of proving by a preponderance of the evidence that the

petitioner's detention is lawful." CMO § II.A (citing *Boumediene*, 128 S. Ct. at 2271). Until

earlier this year, the analysis of whether a petitioner's detention was lawful centered on whether

a detainee was an "enemy combatant." On March 13, 2009, however, the government

abandoned its previous reliance on the phrase "enemy combatant" and reformulated its position

regarding the scope of its detention authority. *See* Govt's Mem. (Mar. 13, 2009). The

government now offers the following definition for the scope of its detention authority:

> The President has the authority to detain persons that the President determines
> planned, authorized, committed, or aided the terrorist attacks that occurred on

4

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

> September 11, 2001, and persons who harbored those responsible for those attacks. The President also has the authority to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces.

*Id.* at 2.

The government has explained that "[e]vidence relevant to a determination that an individual joined with or became part of al-Qaida or Taliban forces might range from formal membership, such as through an oath of loyalty, to more functional evidence, such as training with al-Qaida (as reflected in some cases by staying at al-Qaida or Taliban safe houses that are regularly used to house military recruits) or taking positions with enemy forces." *Id.* at 6-7.[1]

Judges Walton and Bates have each issued lengthy, detailed and well-reasoned opinions regarding the scope of the government's detention authority. *See generally Gherebi v. Obama*, 609 F. Supp. 2d 43 (D.D.C. 2009); *Hamlily v. Obama*, 616 F. Supp. 2d 63 (D.D.C. 2009). As explained in more detail below, the crux of the distinction between the two approaches lies in whether the government has the authority to detain individuals who substantially supported enemy forces and/or directly supported hostilities against the United States. Judge Walton has concluded that the government does have this authority, *Gherebi*, 609 F. Supp. 2d at 68-70, while Judge Bates has held that it does not, *Hamlily*, 616 F. Supp. 2d at 76.

---

[1] The government asks that "[t]he probity of any single piece of evidence . . . be evaluated based on the evidence as a whole." Govt's Mot. for J. on the R. at 20. Thus, although the government does not explicitly endorse the "mosaic theory," which posits that each piece of intelligence should be viewed as a "tile" forming a "mosaic" of information about an individual, the government "is, as a practical matter, arguing for its application to the evidence in this case." *Al-Adahi v. Obama*, 2009 WL 2584685, at *4 (D.D.C. Aug. 21, 2009).

5

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Judge Walton "agree[d] with the government that the [Authorization for Use of Military Force ("AUMF")[2]] functions as an independent basis in domestic law for the President's asserted detention authority," *Gherebi*, 609 F. Supp. 2d at 54, and adopted the basic framework proposed by the government, including the "substantial support" provision, *id.* at 68-70. He specified, however, that "the government's 'substantial support' standard . . . mean[s] individuals who were members of the 'armed forces' of an enemy organization at the time of their initial detention. It is not meant to encompass individuals outside the military command structure of an enemy organization." *Id.* at 70.

Judge Bates, in contrast, rejected altogether the concept of "substantial support" as an independent basis for detention. *Hamlily*, 616 F. Supp. 2d at 76. He also concluded that "directly support[ing] hostilities" is not a proper basis for detention. *Id.* at 77. In short, Judge Bates found "no authority in domestic law or the law of war . . . to justify the concept of 'support' as a valid ground for detention." *Id.* at 69. Judge Bates agreed with Judge Walton and the government, however, in holding that the government has the authority to detain those who "planned, authorized, committed, or aided" the September 11, 2001 attacks and "persons who harbored those responsible for those attacks," as well as individuals "who were part of . . . [enemy forces], including any person who has committed a belligerent act . . . in aid of" enemy forces. *Id.* at 78.

Judge Bates noted that the process of determining which individuals were "part of" enemy forces is necessarily more functional than formal. *Id.* at 75. Quoting Judge Walton, he observed that "[t]he key inquiry . . . is not necessarily whether one self-identifies as a member of

---

[2]   The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." 115 Stat. 224.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

the organization . . . but whether the individual functions or participates within or under the command structure of the organization – i.e., whether he receives and executes orders or directions."[3]  *Id.* at 75 (citing *Gherebi*, 609 F. Supp. 2d at 68-69). And, as the government conceded at oral argument in Judge Bates's case, the government's detention authority "does not encompass those individuals who unwittingly become part of the al Qaeda apparatus – some level of knowledge or intent is required." *Hamlily*, 616 F. Supp. 2d at 75.

Several other judges have adopted Judge Bates's approach, narrowing the scope of the government's detention authority by excluding the authority to detain those who only "substantially supported" enemy forces or "directly supported hostilities" in aid of enemy forces. *See, e.g., Al-Rabiah v. United States*, 2009 WL 3083077, at *4 (D.D.C. Sept. 17, 2009) (Kollar-Kotelly, J.); *Awad v. Obama*, 2009 WL 2568212, at *2 (D.D.C. Aug. 12, 2009) (Robertson, J.); *Mattan v. Obama*, 618 F. Supp. 2d 24, 26 (D.D.C. 2009) (Lamberth, C.J.).

The petitioner does not object to the frameworks endorsed by either Judge Walton or Judge Bates. He accurately summarizes their approaches by observing that

> the Government's detention authority, as defined by it and subject to the explanations and qualifications of Judges Walton, Bates, and Lamberth, extends only to individuals in the following categories:
> 1)   Persons who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001;
> 2)   Persons who harbored those responsible for the September 11 attacks;

---

[3]   It bears noting that Judge Walton's approach, like that of Judge Bates, requires that an individual be part of the command structure of an enemy organization in order for the government to properly detain him or her.  The key difference between the two approaches is that Judge Walton has held that an individual "substantially supports" an enemy organization only if he or she acts within "the military command structure of an enemy organization," *Gherebi v. Obama*, 609 F. Supp. 2d 43, 70 (D.D.C. 2009), whereas Judge Bates has held that an individual who acts within the command structure is "part of" an enemy organization – as opposed to just "substantially supporting" it – and that one who merely "substantially supports" an enemy organization is not properly detained, *Hamlily v. Obama*, 616 F. Supp. 2d 63, 69 (D.D.C. 2009).  As Judge Bates noted, "as applied in specific cases, the difference [between the two approaches] should not be great."  Judge Bates also observed that despite his "rejection of 'substantial support' as an independent basis for detention, the concept may play a role under the functional test used to determine who is a 'part of' a covered organization." *Id.* at 76.

7

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

> 3) Persons who committed belligerent acts or engaged in hostilities against the United States or its coalition partners; and
>
> 4) Persons who were part of Taliban or al Qaeda forces (or associated forces) that are engaged in hostilities against the United States or its coalition partners, such that the persons received and executed orders within the command structure of such an enemy force.

Petr's Cross-Mot. for J. on the R. at 13. The petitioner maintains that he falls into none of these categories and, therefore, that his detention is unjustified. *See generally id.*

As Judge Bates explained in *Hamlily*, the government has been unable to justify the "substantial support" prong based on the law of war because the law of war permits the detention only of individuals who were "part of" one of the organizations targeted in the AUMF. *Hamlily*, 616 F. Supp. 2d at 76. As a result, the government seeks to justify the detention of those who "substantially supported" enemy forces by importing principles of domestic criminal law. *Id.* But as Judge Bates aptly recognized, the President's detention authority only extends to the limits of the AUMF and the law of war, without regard to principles of domestic criminal law. *See id.* Accordingly, the court adopts the framework formulated by Judge Bates and endorsed by Chief Judge Lamberth, Judge Kollar-Kotelly and Judge Robertson and holds as follows: the President has the authority to detain persons who it proves by a preponderance of the evidence planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, and persons who it proves by a preponderance of the evidence harbored those responsible for those attacks, as well as persons who it proves by a preponderance of the evidence were part of Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners ("the enemy armed forces"), including any person who has committed a belligerent act in aid of those forces. The President does not have the authority to detain persons solely based on a determination that they substantially supported the enemy armed forces or directly supported hostilities in aid of those forces.

8

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

The government does not contend that petitioner Hatim planned, authorized, committed,

aided or harbored those responsible for the September 11, 2001 attacks. *See generally* Govt's

Mot. for J. on the R.  Therefore, the petitioner's detention is justified only if the government

proves by a preponderance of the evidence that the petitioner served as part of the enemy armed

forces, such as by committing a belligerent act in aid of those forces.  The government may not

meet its burden solely by demonstrating that the petitioner substantially supported the enemy

armed forces or directly supported hostilities in aid of those forces.

### B.  Admissibility of and Weight Afforded to Hearsay Evidence

Section II.C of the CMO addresses the admissibility and weight of hearsay evidence.  It

establishes that

> [o]n motion of either the petitioner or the government, the Merits Judge may
> admit and consider hearsay evidence that is material and relevant to the legality of
> the petitioner's detention if the movant establishes that the hearsay evidence is
> reliable and that the provision of nonhearsay evidence would unduly burden the
> movant or interfere with the government's efforts to protect national security.  *See
> Hamdi*, 542 U.S. at 533-34 (noting that, in enemy-combatant proceedings,
> "[h]earsay . . . may need to be accepted as the most reliable available evidence") .
> . . . If the Merits Judge admits hearsay evidence, the party opposing admission
> will have the opportunity to challenge the credibility of, and weight to be
> accorded, such evidence.

CMO § II.C.

The CMO also provides that

> [t]he Merits Judge may accord a rebuttable presumption of accuracy and
> authenticity to any evidence the government presents as justification for the
> petitioner's detention if the government establishes that the presumption is
> necessary to alleviate an undue burden presented by the particular habeas corpus
> proceeding.

CMO § II.B; *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004) (noting that "enemy-

combatant proceedings may be tailored to alleviate their uncommon potential to burden the

Executive at a time of ongoing military conflict . . . [For example,] the Constitution would not

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided").

At the merits hearing, the government offered hearsay evidence contained in interrogation reports ("FD-302s")[4] and intelligence reports[5] (including DOD Intelligence Investigations Reports ████████████████████ The government asks that the court deem all of the hearsay evidence sufficiently reliable to be admitted "unless sufficient credible evidence at the merits hearing establishes that [a particular piece of] information is unreliable." Govt's Mot. to Admit Hearsay Evidence with a Presumption of Accuracy and Authenticity ("Govt's Hearsay Mot.") at 1. Further, the government asks that its hearsay evidence be deemed accurate and authentic unless the accuracy and authenticity of specific pieces of evidence are rebutted with sufficient credible evidence at the merits hearing. *See generally id.*

The government first asserts that the interrogation reports and intelligence reports are regularly prepared and relied on for national security operations. *Id.* at 5-6. Therefore, the evidentiary principles underlying Federal Rule of Evidence 803, which allows for the admissibility of certain business records and official reports, compel admitting the reports at issue here. *Id.* at 7-9.

---

[4]    The government defines FD-302s as

> non-verbatim records of witness statements [that] constitute a 'summary of a witness's or subject's oral interview, based on the interviewer's understanding of the information provided by the witness' . . . . FBI FD-302s are prepared according to FBI requirements that ensure the accuracy of the records, including requirements that agents verify that the FD-302 accurately reflects the witness' statement and the criteria for using reliable interpreters[, and w]henever the FBI requires interpreters or translators, they must meet FBI standards.

Govt's Mot. for J. on the R. at 3.

[5]    The government defines intelligence reports as "compilations of important information regularly prepared by professionals and routinely relied upon by the Government for wartime intelligence . . . . Intelligence Investigations Reports ('IIRs') are the main intelligence report used by the Defense Intelligence Agency ('DIA') and military services for human intelligence information." *Id.* at 2.

10

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

The government next argues that the court should admit hearsay evidence and afford it a presumption of accuracy and authenticity to avoid placing an undue burden on the government during a time of military conflict. *Id.* at 11-14. Because nearly all of the evidence in this case is hearsay, the case would not survive and the nation's security would be placed at risk if hearsay evidence were not admitted and government agents had to be called into court to testify as to the statements that detainees made during interrogations. *Id.*

Admitting hearsay evidence with a presumption of accuracy and authenticity would also be consistent with *Hamdi*, which stated that "[h]earsay . . . may need to be accepted as the most reliable available evidence from the Government," 542 U.S. at 533-34, as well as the Detainee Treatment Act, which provided for a rebuttable presumption in favor of the government's evidence, and *Boumediene*, which stressed that GTMO habeas procedures should be adapted to alleviate any undue burden on the government. Govt's Hearsay Mot. at 11-14. In addition, the government points out that hearsay is allowed in other proceedings affecting individuals' liberty interests, such as pretrial detention hearings, sentencings and statutory habeas cases. *Id.* at 14-15.

The petitioner opposes the government's motion, arguing that the government has made only generic claims about the general reliability of intelligence reports and interrogation reports, rather than identifying what pieces of hearsay evidence it seeks to introduce and why those specific pieces of evidence are reliable. Petr's Opp'n to Govt's Hearsay Mot. at 2-4. Because the CMO requires a showing of reliability before hearsay evidence can be admitted, the petitioner urges the court to "examin[e] the proffered evidence on an item-by-item basis." *Id.* at 3-4. In addition, the petitioner complains that the government has failed to address whether

11

UNCLASSIFIED//FOR PUBLIC RELEASE

~SECRET~

nonhearsay evidence exists that could support the assertions contained in the hearsay statements, or to show that providing nonhearsay evidence would be unduly burdensome. *Id.* at 4.

Addressing the specific evidence at issue in this case, the petitioner complains that the interrogation summaries on which the government relies lack sufficient indicia of reliability. Petr's Cross-Mot. for J. on the R. at 2-6. The documents are unsworn and do not purport to be verbatim recitations of what the petitioner and other detainees actually said. *Id.* at 2. Instead, the reports are summaries of the English translations of the detainees' statements, which were originally made in Arabic. *Id.*

Further, the petitioner contends that there is ample reason to doubt the accuracy of the translations. *Id.* at 2-3. The major general who was commander of the joint task force responsible for the GTMO interrogations (now retired) has himself opined that "the military linguists [at GTMO] were worthless." *Id.* at 3 & Ex. 4. And translating Arabic poses unique challenges, given that there are multiple dialects that are in some cases dissimilar to each other and to Modern Standard Arabic, the version most commonly taught to non-native speakers. *Id.* at 3. There is an audio recording of only one interrogation – an interrogation that took place in a proceeding before the Combatant Status Review Tribunal ("CSRT") – and the petitioner offers an expert's declaration asserting that the English translation of his statements at that hearing contain numerous errors.[6] *Id.* & Ex. 3. Based on that example, and in light of the fact that the government has offered no evidence concerning the credentials of the translators used in the

---

[6]    The government counters that "it is clear from the audio of the CSRT hearing that Petitioner and the interpreter at that hearing were able to communicate effectively . . . . Moreover, Petitioner has not identified any material inaccuracies in statements that the Government relies upon from the CSRT hearing." Govt's Reply in Support of Mot. for J. on the R. at 3 n.1. In any event, the government argues, "the Court has no basis to conclude that [the petitioner's expert's] interpretation of what Petitioner said during the CSRT hearing is more accurate than that of the interpreter who was actually at the CSRT hearing and who was actually able to communicate effectively with Petitioner." *Id.* at 3-4 n.1.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

interrogations, the petitioner urges the court not to rely on the summaries of his interrogations. *Id.*

The petitioner also observes that the documents relied on by the government lack credibility because they are raw intelligence, not "final evaluated intelligence." *Id.* at 4. Recalling that the Circuit in *Parhat* directed district courts to hold that the government has met its burden only if they find that the government's evidence is "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty," the petitioner urges the court to conclude that the government's intelligence reports are not reliable. *Id.* at 5.

At the merits hearing, the court admitted the hearsay evidence being offered by the government, but noted that it would make individualized determinations about the reliability and accuracy of that evidence and the weight to be afforded to it. Unclassified Hr'g Tr. at 6-7. Based on the principles underlying Federal Rule of Evidence 803(6), the court presumes that the interrogation reports and intelligence reports are authentic. *See Ahmed v. Obama*, 613 F. Supp. 2d 51, 54 (D.D.C. 2009). As for the government's request for a presumption of accuracy, the court notes Judge Kessler's observation that there is ample reason not to afford the government's evidence this presumption, "ranging from the fact that it contains second- and third-hand hearsay to allegations that it was obtained by torture to the fact that no statement purports to be a verbatim account of what was said." *Id.* at 55. Moreover, the court concludes that the government has failed to establish that a presumption of accuracy is necessary to alleviate an undue burden. Finally, as Judge Kessler pointed out, "given the fact that this is a bench trial, the Court must, in any event, make the final judgment as to the reliability of these documents, the

13

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

weight to be given to them, and their accuracy." *Id.* Accordingly, the court will not presume

that the hearsay evidence offered in this case is accurate.

### C. The Court Grants Petitioner Hatim's Petition for Writ of Habeas Corpus

#### 1. The Government's Justification for Detention

The government asserts that the President has the authority to detain the petitioner under

the AUMF, as informed by the law of war, because the petitioner is a member of al-Qaida and

the Taliban and committed belligerent acts in furtherance of those organizations' mission. *See*

*generally* Govt's Mot. for J. on the R.  More specifically, the government asserts that the

petitioner (1) trained at al-Farouq, an al-Qaida terrorist camp, *id.* at 27-29; (2) stayed at al-Qaida

and Taliban guesthouses, *id.* at 29-30 ███████████████████████████████████

███████████████████████████████ (3) operated under the command of al-

Qaida and the Taliban at the battlefront against the Northern Alliance, *id.* at 30-31; (4) ██████

███████████████████████████████████████████████████████

███████████████████ and (5) was identified by a witness – GTMO detainee[1] ██████

██████████████ – as having fought in the battle of Tora Bora against the United States and

its coalition partners, *id.* at 32-34.  The government's case rests on intelligence reports and

reports of interviews with both the petitioner and [1] ███████

The petitioner vigorously disputes the government's allegations. *See generally* Petr's

Cross-Mot. for J. on the R.  He claims that he was in Afghanistan when the United States

initiated hostilities there in Fall 2001 and concedes that he fled to Pakistan out of fear for his

personal safety, but maintains that there is no basis for his detention because there is no evidence

that he was connected to the September 11, 2001 attacks, was part of al-Qaida or the Taliban or

engaged in hostilities against the United States or its coalition partners. *Id.* at 13-30.

14

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

The petitioner claims that after he was captured in Pakistan, he was held for six months at a military base in Kandahar, Afghanistan, where he was severely mistreated, including being beaten repeatedly, being kicked in the knees and having duct tape used to hold blindfolds on his head. *Id.* at 32. To this day, he cannot raise his left arm without feeling pain. *Id.* The petitioner also alleges that he was threatened with rape if he did not confess to being a member of the Taliban or al-Qaida. *Id.* As a result, he claims that the inculpatory statements that he made in Kandahar were made only because of these threats. *Id.* He further alleges that after being transferred to GTMO in 2002, he repeated those inculpatory statements in 2004 because he feared that he would be punished if he changed his story. *Id.* at 32-33.

The government does not refute the petitioner's allegation of coercion or the widespread allegations of torture of other detainees prior to their arrival at GTMO. *See* Govt's Mot. for J. on the R. at 39-42. The government points out, however, that ██████████████████████ ████████████████████████████████ *Id.* at 40. In fact, al-Qaida and Taliban operatives were ████████████████████████████████ ████████████████████████████.[7] *Id.* In any event, the government argues, because it does not rely on any statement that the petitioner made prior to his arrival at GTMO, his "allegations of coercion at the hands of American forces at Kandahar" fail to cast doubt on the government's evidence, nearly all of which was obtained well after the alleged coercion. *Id.* at 41-42.

---

[7] ██████████████████████████████████████████ ███████████████████████████ Govt's Mot. for J. on the R. at 18-19.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

### 2. Examining the Alleged Facts

### a. Allegation that the Petitioner Attended the Al-Farouq Training Camp

The government's primary assertion in support of its detention of the petitioner concerns the petitioner's alleged attendance at the al-Farouq training camp. *See* Govt's Mot. for J. on the R. at 4-10. ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ *Id.* at 4-5. ███████████████████████████

███████████████████████████████████████████████████ *Id.* at 4.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

collected donations from friends and members of his mosque and left Yemen for Afghanistan in 2001 to obtain training at al-Farouq. *Id.* at 6-7. He felt the religious call to wage jihad and was considering traveling to Chechnya after training at al-Farouq to fight the Russians with other Muslims. *Id.* at 5-7. The petitioner also planned to send word to his friends back in Yemen if the training at al-Farouq was worthwhile. *Id.* at 5.

During his testimony before the Combatant Status Review Tribunal ("CSRT") on January 16, 2005, the petitioner told the CSRT that as a foreigner, he made an effort to make connections with the Taliban while in Afghanistan because the Taliban was the governing authority there. *See* Govt's Hr'g Ex. 9 at 2. The government's interrogation summaries also reflect that the

16

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

petitioner told interrogators that after leaving Yemen, he arrived at the Haji Habash guesthouse in Kandahar, Afghanistan in 2001. *See* Govt's Mot. for J. on the R. at 7-8. The government notes that Haji Habash and other guesthouses █████████████████████████████ stations for al-Qaida and Taliban fighters, and that Haji Habash in particular was used as a ███████████████ for trainees heading to █████████ and other camps. *See id.* at 7. ██████ ████████████████████████████████████████████████████████████████ ████████████  *See id.*

According to the government's interrogation summaries, the petitioner admitted that he took a bus to al-Farouq in Spring 2001. *See id.* at 8. He told government interrogators that he did not realize that al-Farouq was an al-Qaida camp until he left the camp. *See id.* at 9 n.5. He described a typical day at al-Farouq as waking up before daylight, praying, memorizing the Koran, exercising, eating breakfast and then receiving weapons training. *See id.* at 9. Consistent with this allegation, the petitioner told the CSRT that he trained at al-Farouq in mid-2001 to learn more about weapons, and that he obtained training on an AK-47, a rocket-propelled grenade, a pistol and other weapons. *See id.* During the weapons training, the instructors carried the weapons and the students maintained notebooks. *See id.* After three to four weeks at al-Farouq, the petitioner returned to the Haji Habash guesthouse for two days, then went to Kabul, Afghanistan. *See id.*

Responding to the government's allegations, the petitioner asserts as a preliminary matter that he was never at al-Farouq. *See* Petr's Cross-Mot. for J. on the R. at 21. Furthermore, the petitioner asserts that if the court accepted the government's summaries of his interrogations as true and accurate, these statements would still fail as justification for his detention. *See id.* at 21-23. More specifically, the petitioner points out that the statement that he went to al-Farouq "to

17

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

be trained to fight the Russians" in Chechnya would support the position that he was not there to support al-Qaida or the Taliban, nor did he even realize that al-Farouq was an al-Qaida camp until he left the camp. *See id.* at 22.

In addition, the petitioner claims that his statements do not give rise to an inference that he operated under al-Qaida's "direction and control" at al-Farouq. *See id.* He testified that "nobody is going to tell you what to do" at al-Farouq. *See id.* He felt he was free to walk out at any time, and indeed, he left the camp on his own volition when he became dissatisfied with it after three to four weeks. *See id.*

Finally, the petitioner claims that he further distanced himself from al-Qaida's and the Taliban's command structure long before he was captured in Pakistan. *See id.* Therefore, even if the petitioner was acting under the enemy armed forces' "direction and control" while at al-Farouq, the government has failed to demonstrate that he was still doing so at the time of his capture, as it is required to do. *See id.* at 22-23.

The petitioner's admission, made during several interrogations and at his CSRT proceeding, is the only evidence that he attended al-Farouq and arguably constitutes the government's strongest purported basis for his detention. The petitioner has offered specific, unrefuted evidence, however, that he was tortured at Kandahar and that he told his interrogators that he had attended al-Farouq only to avoid further punishment. *See* Traverse, Ex. 1 ("Petr's Decl.") ¶ 29. The petitioner also maintains that he told the CSRT that he had trained at al-Farouq only because he would be punished if he gave the tribunal a different account than what he had previously told interrogators. *See id.*

As Judge Kessler has observed in another GTMO habeas case involving a third-party witness who claimed to have been tortured, when – as here – the government presents no

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

evidence to dispute the detainee's allegations of torture and fails to demonstrate that the detainee

was unaffected by his past mistreatment, the court should not infer that the prior instances of

coercion or torture did not impact the accuracy of the detainee's subsequent statements. *See*

*Ahmed v. Obama*, 613 F. Supp. 2d 51, 58 (D.D.C. 2009) (granting the petitioner's habeas

petition). Put differently, petitioner Hatim's unrefuted allegations of torture undermine the

reliability of the statements made subsequent to his detention at Kandahar. Thus, the

government faces a steep uphill climb in attempting to persuade the court that the petitioner's

detention is justified based on the allegation that he trained at al-Farouq, given that the sole

evidence offered in support of that allegation is tainted by torture.

Several other problems with the government's evidence make it even more difficult to

justify the petitioner's detention on this basis. First, even assuming, *arguendo*, that the petitioner

was telling the truth when he confessed to having attended al-Farouq, the evidence that the

petitioner's attendance constituted deliberate involvement with al-Qaida is undermined by the

fact that he allegedly stated during his interrogation on ██████████████ that he did not realize

that al-Farouq was an al-Qaida camp until close to the end of his time there. Govt's Hr'g Ex. 12

at 2. In addition, during an interrogation on ██████████████ the petitioner allegedly stated that

toward the end of his time at al-Farouq, he heard that Usama bin Laden might be visiting.

Govt's Hr'g Ex. 37 at 1. "[T]his was a 'red flag' for [the petitioner] to leave the camp." *Id.*; *see*

*also Hamlily*, 616 F. Supp. 2d at 75 (holding that the government's detention authority "does not

encompass those individuals who unwittingly become part of the al Qaeda apparatus").

Second, even assuming, *arguendo*, that the petitioner was telling the truth when he

confessed to having attended al-Farouq *and* that the petitioner knew that by attending al-Farouq

he was becoming part of the al-Qaida apparatus, there is scant evidence that while at al-Farouq

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

the petitioner actually participated in al-Qaida's command structure by receiving and executing

orders or directions. *See Hamlily*, 616 F. Supp. 2d at 75 (citing *Gherebi*, 609 F. Supp. 2d at 68-

69). The petitioner described a "typical day" at the camp and stated that he received classroom

instruction in the cleaning and assembly of weapons, but at no point did the petitioner admit to

taking up arms on behalf of al-Qaida or otherwise indicate that he ever followed a single order

issued by anyone at al-Farouq. *See* Govt's Hr'g Exs. 12, 17 (describing the training program at

al-Farouq). Nor did any third-party witness indicate that the petitioner was even seen at al-

Farouq, much less that he was seen following orders on al-Qaida's behalf. This deficiency in the

government's evidence further undermines its case for detention. *Cf. Al-Adahi v. Obama*, 2009

WL 2584685, at *9 (D.D.C. Aug. 21, 2009) (granting the petitioner's habeas petition after

concluding that the petitioner "did not, by virtue of less than two weeks' attendance at a training

camp from which he was expelled for breaking the rules, occupy 'some sort of structured' role in

the 'hierarchy' of the enemy force"); *Al Ginco v. Obama*, 626 F. Supp. 2d 123, 129 (D.D.C.

2009) (granting the petitioner's habeas petition, observing that "to say the least, five days at a

guesthouse in Kabul combined with eighteen days at a training camp does not add up to a

longstanding bond of brotherhood," and concluding that "the government has demonstrated, at

most, that [the petitioner] was trusted enough to be inducted into al Qaeda's military training

program . . . . [I]t is highly unlikely that by that point in time al Qaeda (or the Taliban) had any

trust or confidence in him").

Finally, even if the court credits the government's evidence that the petitioner was telling

the truth when he confessed to having attended al-Farouq, *and* that the petitioner knew that by

attending al-Farouq he was becoming part of the al-Qaida apparatus, *and* that the petitioner

received and executed orders or directions on behalf of al-Qaida, the court may only conclude

20

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

that the petitioner's detention is justified if the government proves that the petitioner was a

member of al-Qaida not only when he was at al-Farouq, but also at the time of his capture. *See*

*Gherebi*, 609 F. Supp. 2d at 71. The court finds no basis for that determination. The petitioner

told his interrogators repeatedly that he left al-Farouq early because he was unhappy there. The

October 22, 2002 interrogation report states that the petitioner "did not want to stay in AL-

FAROUK any more. [He] added that life at AL-FAROUK was not what he expected and he

became disillusioned." Govt's Hr'g Ex. 13 at 1. And during an █████████████ interrogation,

the petitioner stated that he

> left the camp early because it wasn't what he expected. To get out early, [he]
> faked having a fever, telling the people at the camp he was ill and needed to seek
> medical care. He wanted to leave earlier, but couldn't think of a good excuse.
> When asked why he left, [he] stated the experience and training wasn't what he
> expected. The trainers were always yelling at him, the food was terrible, and he
> was forced to sleep on the ground. [The petitioner] stated overall it was just 'a
> very bad experience.'

Govt's Hr'g Ex. 17 at 1.

Evidence that the petitioner left al-Farouq early is consistent with the petitioner's claim

that he separated himself from the enemy armed forces' command structure prior to his capture,

further undermining the government's already weak case for detention. *See Al Ginco*, 626 F.

Supp. 2d at 130 (noting that intervening events could terminate an individual's relationship with

al-Qaida).

Based on all of the foregoing reasons, the court concludes that the government has failed

to justify the petitioner's detention based on the allegation that the petitioner trained at al-Farouq.

### b. Allegation that the Petitioner Fought Against the Northern Alliance at Said Central Station

The government asserts that the petitioner admitted to spending approximately three

weeks, along with about fifteen other Arabs, under the command of Abu al-Bara fighting against

21

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

the Northern Alliance at a place called "Said Central Station." *See* Gov't's Mot. for J. on the R.

at 29-30. Said Central Station was located on the rear lines near Bagram, Afghanistan. *See id.* at

30. The petitioner allegedly stated that he was not allowed on the front lines because he was a

newcomer who had not yet been evaluated, but that he would occasionally check out an AK-47

for protection and drive to the front lines to deliver food to the fighters. *See id.* The petitioner

allegedly told the CSRT that he spent three weeks in Kabul and that he occasionally "hopped in

the car that was carrying the food" to the front lines. *Id.* (citing Gov't's Hr'g Ex. 9 at 5). "Then

[he] came back with the car at the end of the day."[8] *Id.*

    The petitioner responds that during his interrogations and CSRT testimony, he described

Said Central Station as a "rest and recreation area" and stated that he spent his time there playing

soccer and riding horses. *See* Petr's Cross-Mot. for J. on the R. at 15-16, 23-24. His brief visits

to the front lines were not conducted at anyone's command; rather, he went there out of

curiosity, "to see what it was like." *Id.* at 23. As with his description of al-Farouq, the petitioner

testified that at Said Central Station, "people came and went as they pleased," which, according

to the petitioner, refutes the government's argument that the petitioner was acting within enemy

armed forces' command structure while there. *Id.*

    The court rejects the government's assertion that the petitioner's own statements prove

that while at Said Central Station, he "function[ed] or participat[ed] within or under the

command structure of [al-Qaida] – i.e., . . . receive[d] and execute[d] orders or directions."

*Hamlily*, 616 F. Supp. 2d at 75 (citing *Gherebi*, 609 F. Supp. 2d at 68-69). As a preliminary

matter, contrary to the government's portrayal of the petitioner's statements, the petitioner did

---

[1]    The government also notes that detainee ▮ identified a photograph of the petitioner as
Said Muhammed Saleh Hatim from Ibb, Yemen. Gov't's Mot. for J. on the R. at 15 (citing ISN
2▮ SIR (Jan. 4, 2006)). ▮ told his interrogators that the petitioner worked with heavy
weapons on the front lines at Bagram. For the reasons discussed in Part III.C.5 *infra*, however,
the court does not credit this allegation.

22

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

not admit to fighting against the Northern Alliance. Indeed, upon a close examination of the

petitioner's statements, the court concludes that the petitioner admitted to *no* conduct that the

court could reasonably construe as serving within al-Qaida's command structure. Although the

petitioner seemed to recognize that al-Bara was in charge of the individuals positioned at Said

Central Station, and seemed to be aware of other individuals who occupied positions of power

within the al-Qaida apparatus, there is little indication that the petitioner himself served on behalf

of al-Qaida during his stay at Said Central Station or at any other time. At most, the petitioner's

statements support the allegation that he was surrounded by enemy armed forces at Said Central

Station and that he occasionally rode in a car that delivered food to combatants on the front lines.

But even if the court were to make that determination by a preponderance of the evidence, it

would be insufficient to prove that the petitioner was "part of" al-Qaida. *See, e.g., Hamlily,* 616

F. Supp. 2d at 76 (holding that even *substantially* supporting the enemy armed forces, without

more, would be insufficient to justify a petitioner's detention). Accordingly, the court concludes

that the government's allegations concerning the petitioner's purported conduct at Said Central

Station do not constitute a lawful basis for his detention.

### c. Allegation that the Petitioner Stayed at al-Qaida Guesthouses in Kabul

According to the government's interrogation summaries, the petitioner told his

interrogators that he stayed at several al-Qaida-affiliated guesthouses while in Kandahar and

Kabul. *See* Govt's Mot. for J. on the R. at 29-30. The first guesthouse, at which the petitioner

stayed for approximately forty days in Kandahar before and after attending al-Farouq, was

known as the Haji Habash house. *See id.* at 29. According to government intelligence, █████

█ ███████████████████████████████████ Govt's Hr'g Ex.

6 at 3. After leaving Kandahar for Kabul, the petitioner allegedly stayed at a guesthouse known

23

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

as Ghulam Bacha. *See* Govt's Mot. for J. on the R. at 30. Another individual named Abdul

Zahir told interrogators that Ghulam Bacha was owned and operated by al-Qaida and was a

safehouse for al-Qaida members from Yemen, Saudi Arabia, Iraq and Libya. *See id.* The

petitioner also allegedly stayed at a third guesthouse, known as Carte Birwan. *See id.* Carte

Birwan was protected by two armed guards, and individuals entering the house had to leave their

weapons with the armed guards. *Id.* Finally, from in or around June 2001 until he fled

Afghanistan in November 2001, the petitioner allegedly stayed at a guesthouse run by Hamza al-

Gatee (a.k.a. Abu Hamza), whom another detainee (Humud Dakhil Said al-Jadani, ISN 230)

identified as having influence with al-Qaida and the Taliban and attending a high-level meeting

of al-Qaida and Taliban members. *See id.* At that guesthouse, the petitioner gave al-Gatee his

passport and was not required to pay for his food. *See id.* at 28. The petitioner also stated that he

was paid between 5,000 and 10,000 rupees "for his efforts," and on one occasion the petitioner

opined that the money had come from al-Gatee directly. *See* Govt's Response to Petr's Cross-

Mot. for J. on the R. at 24.

　　The petitioner counters that although the government attempts to characterize the

guesthouses at which the petitioner stayed as "barracks" for al-Qaida and the Taliban, no

evidence in the record supports that conclusion or shows that the petitioner acted "under the

command structure of al-Qaida and Taliban forces" while staying at the guesthouses. *See* Petr's

Cross-Mot. for J. on the R. at 24. The petitioner notes that Judge Kessler has already rejected the

government's theory that staying at a guesthouse is evidence of affiliation with or support for the

enemy armed forces. *See id.* To the contrary, Judge Kessler noted that there is "ample evidence

that these kinds of guesthouses are common features in the region and that many young men who

are traveling or studying who do not have much money stay at these guesthouses and also stay at

24

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

-SECRET-

those guesthouses associated with either their own nationality . . . or . . . with their own particular religion." *Id.* (citing *Ahmed v. Obama*, Civil Action No. 05-1678 (May 19, 2009)). The petitioner has submitted expert witness statements to corroborate Judge Kessler's determination that guesthouses are roughly akin to youth hostels, except that guests sometimes perform chores in lieu of paying for room and board. *See* Petr's Cross-Mot. for J. on the R. at 24-25. In short, the petitioner claims that the fact that he stayed at guesthouses cannot justify his detention on a "guilt by association" theory. *See id.* at 25.

As for the money that the petitioner was allegedly paid "for his efforts" while staying at the guesthouse run by al-Gatee, the petitioner declares only that he would find money on his bed from time to time, and surmises that the money came from another individual at the house who took pity on the petitioner because he had very little money of his own. *See* Petr's Decl. ¶ 18. The petitioner notes that anonymous charity is common in his culture. *See id.*

The court agrees with the petitioner that the government's evidence concerning his stays at guesthouses is insufficient to meet the government's burden. The record is utterly devoid of evidence that the petitioner was aware of any affiliation that the guesthouses at which he stayed may have had with al-Qaida or the Taliban. Even crediting the government's assertion that al-Gatee, an individual who allegedly occupied a position of power within the al-Qaida hierarchy, paid the petitioner money "for his efforts," the government has offered no evidence as to what those "efforts" were. In other words, the government has failed to demonstrate that the petitioner acted on behalf of, or occupied a position within the command structure of, the enemy armed forces during his stays at the guesthouses. The petitioner, on the other hand, has offered unrefuted evidence that while in Kabul, he "didn't do much other than shop, go to the pool and park, play soccer, walk around, and read." Petr's Hr'g Ex. 15 at 2. As a result, the evidence

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

concerning the petitioner's stays at guesthouses fails to bolster the government's argument in favor of detention. The court's conclusion on this point is reinforced by the evidence offered by the petitioner that guesthouses in the region served as a common way station for individuals passing through or living temporarily in the region. *See* Traverse, Ex. 2.

The government advances a related allegation, [                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ]

[                    ] Therefore, the court rejects this allegation as a basis for the petitioner's detention.

26

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

### e. Allegation that the Petitioner Fought in the Battle of Tora Bora

The government alleges that during an interrogation in January 2006, detainee ▇▇▇ was shown a photograph of the petitioner and identified the petitioner as Said Muhammad Saleh Hatim from Ibb, Yemen. *See* Govt's Mot. for J. on the R. at 15. ▇▇▇ told his interrogators that the petitioner was at the front lines in Bagram, worked with heavy weapons on the front lines and traveled to Tora Bora from the front lines. *See id.* ▇▇▇ identification is corroborated, the government claims, by the fact that the petitioner was captured near Tora Bora while fleeing Afghanistan. *See id.* at 15-16. The petitioner told interrogators that he, accompanied by Hamza al-Gatee's cook, fled Kabul when the bombing began in the immediate wake of the September 11, 2001 attacks, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See id.* at 15. When the petitioner arrived in Pakistan, he went to a police station to arrange his paperwork to return to Yemen and was arrested. *See id.* at 15-16.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The petitioner correctly points out that in order to determine whether the government has met its burden of persuading the court that the petitioner fought at the battle of Tora Bora, the court must first assess how much weight to afford to ▇▇▇▇'s identification of the petitioner. *See* Petr's Cross-Mot. for J. on the R. at 17. The government maintains that ▇▇▇▇ provided interrogators with accurate, reliable information concerning other GTMO detainees. Govt's Hr'g Ex. 41. Neither party, however, disputes that ▇▇▇▇ has exhibited an ongoing pattern of

---

⁹     The government did not produce the alleged "last will and testament."

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

severe psychological problems while detained at GTMO.  As early as May 2002, a GTMO interrogator opined, "I do not recommend ███████ for further exploitation due in part to mental and emotional problems [and] limited knowledgeability." *Id.*, Ex. 8.  Subsequent to the May 2002 disclaimer concerning ███████ reliability, ███████ received a year of "intensive psychiatric care," after which he attempted to hang himself in his cell in February 2003.  *See* Petr's Cross-Mot. for J. on the R. at 17 & Ex. 9 at 3.  The GTMO hospital record stated that ███████ had "vague auditory hallucinations" and that his symptoms were consistent with a "depressive disorder, psychosis, post traumatic stress, and a severe personality disorder." *Id.*  In March 2003, ███████ again tried to commit suicide, saying that he had received "command hallucinations" to do so.  *See* Petr's Cross-Mot. for J. on the R. at 17-18 & Ex. 9 at 12.  At that time, doctors at the GTMO hospital opined that ███████ psychosis was worsening.  *See id.*

In June 2007, the Office of Administrative Review of the Detention of Enemy Combatants ("OARDEC") warned that because ███████ first-hand knowledge had come into serious question since 2005, all information provided by ███████ should be adequately verified through independent sources.  *See* Petr's Cross-Mot. for J. on the R. at 18.  The court notes that ███████ made the statement about the petitioner during an interrogation in January 2006, a date that falls squarely within the period during which OARDEC recommended not crediting ███████ statements unless they were corroborated by other, more reliable sources.  In addition, the petitioner points out that the personal representative of another GTMO detainee determined that none of the detainees that ███████ had identified as having trained at al-Farouq[10] were even in Afghanistan during the time that ███████ said they attended the camp. *See id.*

---

[10]    This group did not include the petitioner.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

As a result of ▓ 's psychiatric record, Judges Leon and Kessler both observed that ▓ credibility had been seriously called into question. *See El Gharani v. Bush*, 593 F. Supp. 2d 144, 148 (D.D.C. 2009); *Ahmed*, 613 F. Supp. 2d at 56. Judge Kessler concluded that ▓ was "an unreliable source whose statements have little evidentiary value." *Ahmed*, 613 F. Supp. 2d at 57. This court firmly agrees. It refuses to credit what is arguably the government's most serious allegation in this case based solely on one statement, made years after the events in question, by an individual whose grasp on reality appears to have been tenuous at best.

Further, the court disagrees with the government's contention that other evidence substantially corroborates ▓ statement concerning the petitioner. The fact that the petitioner was captured in Pakistan makes it no more likely that he fought at the battle of Tora Bora; many individuals, both combatants and non-combatants, fled Afghanistan for Pakistan when the bombing in Kabul began. Likewise, the fact that the petitioner was captured without a passport and the government's allegation that ▓ was found in his pocket when he was captured ▓ fail to substantially corroborate the allegation that the petitioner fought at Tora Bora. In light of the bombings taking place in Afghanistan in 2001, it is understandable that an individual might have fled to Pakistan and carried ▓ he was engaged in illicit activities or not. Accordingly, these pieces of evidence fail to make it more likely that the petitioner fought in the battle of Tora Bora.

In sum, the court rejects each of the rationales that the government asserts to justify the petitioner's detention. And the government's justification for detention fares no better when the court views all of the evidence as a whole. For as other judges in this court have observed, "the

30

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together . . . . Therefore, if the individual pieces of a mosaic are inherently flawed . . . , then the mosaic will split apart." *Al-Adahi*, 2009 WL 2584685, at *5. In this case, the government has offered the court an inherently flawed justification for detention, a justification that rests primarily on tainted statements made by the petitioner and profoundly unreliable statements made by[1]  ████████  As a result, the court, viewing the evidence as a whole, holds that the government has failed to prove by a preponderance of the evidence that the petitioner served as part of the enemy armed forces.

## IV. CONCLUSION

For the foregoing reasons, the court holds that the government has failed to carry its burden of persuading the court that petitioner Hatim's detention is lawful. Accordingly, the court grants petitioner Hatim's petition for writ of habeas corpus. An Order consistent with this Memorandum Opinion is issued separately and contemporaneously this 15th day of December, 2009.


RICARDO M. URBINA
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE